Rayne Francine KAPUSCHINSKY, a Minor, by her Guardian ad Litem, Raymond S. Kapuschinsky, Plaintiff,

v.

UNITED STATES of America, Defendant.

Civ. A. No. 7646.

United States District Court
D. South Carolina,
Charleston Division.

Jan. 3, 1966.

---

78. See 28 U.S.C. § 1292.

Gedney M. Howe, Arthur G. Howe, and Joseph W. Cabaniss, Charleston, S. C., for plaintiff.

Terrell L. Glenn, U. S. Atty., Columbia, S. C., and Thomas P. Simpson, Asst. U. S. Atty., Charleston, S. C., for defendant.

HEMPHILL, District Judge.

Negligence action against the United States under the Federal Tort Claims Act; minor plaintiff claims she suffers a severe and permanent disabling condition as a direct result of the government's negligence while she was a newborn infant in the United States Naval Hospital, Charleston, South Carolina. The government admits permanent injury and damage is not denied, contended is absence of negligence on its part, denies the sufficiency of any showing of its negligence as the proximate cause of the child's injuries.

The evidence presents minimal factual dispute. On November 14, 1961, Raquel Charlotte Kapuschinsky, dependent wife of Staff Sergeant Raymond Kapuschinsky, United States Air Force, gave birth prematurely to a daughter, Rayne Francine Kapuschinsky, at the United States Naval Hospital, Charleston, South Carolina. The child's weight at birth was approximately 2 pounds 15 ounces and upon examination she was found to be an immature premature child exhibiting many of the symptoms associated with prematurity. From the time of birth and for the entire period of relevance here, the child was in an isolette [1] in the Premature Nursery. This nursery was in a room separate from the Newborn Nursery in which full term infants were kept. The isolette in which the child was kept because of its weight and respiratory difficulty kept it separate from its outside surroundings and in a sense provided an artificial environment for the child designed to take care of its particular and urgent needs. Shortly after birth, hospital personnel noticed that the child was slightly jaundiced. The jaundice became gradually progressive and the child became increasingly lethargic. By November 18, her condition was such that she was placed on the critical list. Because of the progression of the jaundice, it became necessary to perform femoral taps (withdrawing blood from the femoral vein) for the purpose of bilirubin (a substance in the blood) determinations. Exact determinations of the bilirubin

---

1. An isolette is a sophisticated incubator for premature newborns with which oxygen, temperature, and humidity can be effectively controlled, and if handled properly, relative sterility of environment guaranteed.

level in the blood was ruled essential since there is a known connection between high bilirubin levels and brain damage in newborn infants. The progressive jaundice made necessary 3 femoral taps over a 5 day period, namely November 17, 18, and 21. On November 22 these taps were discontinued because the jaundice was gradually clearing, and the child appeared to be easing toward recovery. Dr. John Finklea, the physician at the time in charge of the nursery, stated that on November 21st he noted that the umbilical cord was falling off, a completely normal process. He said that there was some redness around the cord but that there was no swelling, hardness, or increased warmth which would be signs associated with infection. A culture was taken from this area which grew out a common organism, proteus vulgaris, and at that time an antibiotic, bacitracin ointment, was applied.

He further testified as follows:

The nurses called my attention to the fact that the child had not been wiggling her legs as much as usual on the 25th. At that time I examined the child. To that time the child did not have limitation of motion in her hips, she had no swelling, she had no redness when she wasn't kicking. Again this is something that is seen in infants * * * [On] Sunday morning the 26th * * there was obvious swelling and warmth in the child's hips. She had fever. She had not had fever before, and it was apparently an infectious process. (transcript pp. 210–211.)

Doctor Finklea's conclusion that there had been no previous manifestation of fever, no previous manifestations of infectious process in the hips, and that the child had been improving up to the 26th is refuted by the hospital record in which these notations appear:

11/23/61 Baby still lethargic, not as much as couple days ago, also still jaundice. Cond. app. unchanged. * * * cries when disturbed. Lower extremities rigid—

keeps legs & hips wide apart. Still jaundiced. Resp. fairly reg. also pulse. Temperature elevated to 99.6° at 1800. Condition poor.

11/24/61 No change (and yellow stools noted). * * *

11/25/61 No apparent change in condition. Legs rigid. Temp. 100°.

Removed from CL (critical list) * * * by Dr. Finklea. Dr. Finklea aware of baby's hips and legs. Lethargic (and yellow stools noted).

11/26/61 Temp. 101° at 0650. Cond. appears poor. Some swelling noted both hips. Placed on critical list by Dr. Finklea. * * *

The relevance of the foregoing disparity between the testimony and the hospital records will be discussed below where germane.

After the child was placed on the critical list on November 26th, she was immediately transferred from the Premature Nursery to the Pediatric Department where various diagnostic studies were conducted. These studies included x-rays and a general examination of the child. Based upon the findings of Doctor Finklea, Doctor R. I. Sorenson, the hospital orthopedist, was called in to examine the child. Doctor Sorenson found bulging in the area of both hip joints and joined in the other findings made by Doctor Finklea. Based upon these findings, Doctor Sorenson had the child removed from the isolette and incised both hips and drained them sterilely. As the result of this procedure, approximately 1 or 2 ounces of grossly purulent, i. e., infected, material was removed from the hip areas.

At that time, the child was started on antibiotics and the incisions in both hips were irrigated by means of an irrigation drain. After the institution of such treatment, plaintiff began to recover and the hospital records reflect that she continued to progress and gain weight in spite of the infection. X-ray studies before the Court in defendant's Exhibit 5 confirmed the initial diagnosis of osteomyelitis involving both right and left

femurs, pelvic girdle, and some involvement of the right humerus.

The material drained from plaintiff's hips was sent to the hospital laboratory for culture and sensitivity studies. These studies determined that the material from the left hip contained Staphylococcus Aureus Coagulase Positive, sensitive[2] to the drugs Chloromycetin and Furadantin. The material from the right hip was found to contain the organism pseudomonas. It was suspected that this was an overgrowth and that this material actually also contained Staphylococcus Aureus Coagulase Positive. As the result of these laboratory findings, nose and throat cultures were taken from all personnel in the nursery, and it was found that one Corps Wave, Karen Greb (Derteen), had a positive nose culture which showed Staphylococcus Aureus, sensitive to the drugs Aureomycin, Chloromycetin, Terramycin, Tetracyclin, and Furadantin.

Corps Wave Karen Greb (Derteen) entered the Navy March 28, 1961, shortly after completing her high school education. She requested and was assigned to Hospital Corps School after completing a ten week course at Bainbridge, Maryland. Hospital Corps School was conducted at the Great Lakes Naval Center and lasted approximately four months. Mrs. Derteen departed from Great Lakes on October 20, 1961, after the completion of her training and reported to the Charleston Naval Hospital for duty on October 23, 1961, at which time she was assigned to the Newborn Nursery. She was given a physical examination a few days prior to leaving Great Lakes Naval Training Center, was not reexamined upon reporting for duty at Charleston. From October 23, 1961, to November 28, 1961, when the positive cultures were discovered, she experienced no signs or symptoms of any type of illness.

As the result of the child's general physical condition, resulting from prematurity as well as the osteomyelitis described above, the child remained in the hospital some 4 to 5 months before being allowed to go home. During the course of this time she continued to improve and the infection was controlled by the treatment instituted at the hospital. Although the infection was eventually arrested, it is clear that certain permanent residual injuries resulted.

On December 31, 1963, the plaintiff was examined by an orthopedist, Doctor John Arthur Siegling. He found that the child had limitation of motion in the elbow which was minimal and for practical purposes not interfering with function. He found that the right hip was permanently dislocated and that there had been a destructive process in the joint of the left hip which most probably would cause pain in later life. It was his opinion that as a result of damage to the epiphysial (growth) end of the left femur there will be approximately 2 inches difference in the length of the left leg as compared to the right when the child is fully grown. Plaintiff now walks with a severe "sway" and a limp, is required to wear a special orthopedic brace which causes considerable pain.

It is undisputed that there is considerable and serious permanent damage to this child; defendant says simply "no liability." The action is for negligence, not malpractice, as was conceded in an oral argument.

The annotation in 96 A.L.R.2d 1205, 1207, discusses the liability of a hospital to a patient:

> [A] hospital may, under the proper circumstances, be held liable for the negligence or other tortious misconduct of its employees, and * * where this is the case the ordinary rules of tort law apply. Most of the cases herein involve actions based on negligence, and the traditional elements of actionable negligence, namely, the existence of a duty on the part of one person to protect another from injury, the breach of such duty, and resulting injury, are generally applicable.

2. Sensitivity tests, antibiograms, are discussed in note 8, infra.

Also applicable are the rules as to pleading, evidence, burden of proof, etc., developed by statutory and case law with respect to negligence actions generally.

Title 28 U.S.C. § 1346(b) makes it clear that the liability of the government here is to be determined by the law of the place where the alleged negligence occurred. The question is: would a private individual under like circumstances be liable under State law? United States v. Muniz, 374 U.S. 150, 153, 83 S.Ct. 1850, 10 L.Ed.2d 805.

South Carolina law is applicable here, and resort must be had to the State's law of negligence. Unfortunately, for ease of decision, public charities are not liable for negligence of their servants in this State[3], Lindler v. Columbia Hospital, 98 S.C. 25, 81 S.E. 512; Vermillion v. Woman's College of Due West, 104 S.C. 197, 88 S.E. 649, 650; Caughman v. Columbia Y.M.C.A., 212 S.C. 337, 343, 47 S.E.2d 788; so there are no local cases of direct decision on the subject of hospital liability for negligence. But, a purview of the annotation in 96 A.L.R.2d, supra, reveals what Mr. Justice Douglas observed in United States v. Brown, 348 U.S. 110, 113, 75 S.Ct. 141, 143, 99 L.Ed. 139: "Responsibility of hospitals to patients for negligence may not be as notorious as the liability of the owners of automobiles. But the doctrine is not novel or without support." The United States here is in the posture of running a private profit-making[4] hospital for purposes of application of South Carolina law.

 The duty of a hospital to its patients is succinctly set forth in 26 Am.Jur., Hospitals and Asylums § 14, as follows:

The degree of care exacted of private institutions toward their patients is such reasonable care and attention for their safety as their mental and physical condition, if known, may require, and should be in proportion to the physical and mental ailments of the patient, rendering him unable to look after his own safety.

Of course, a higher degree of care is required of a hospital in caring for a child than an adult, St. Lukes Hospital Ass'n v. Long, 125 Colo. 25, 240 P.2d 917, 918, 31 A.L.R.2d 1120, 1126, and, as here, a premature infant is entitled to the highest possible degree of care, consistent with good medical practice, because of its precarious toe-hold on life and its helplessness.

 It is not necessary to show that the hospital generally failed to provide good care, but only that it breached its duty to this particular plaintiff. As the South Carolina Supreme Court stated in Bessinger v. DeLoach, 230 S.C. 1, 94 S.E.2d 3, 5, after citing Green v. Shaw, 136 S.C. 56, 134 S.E. 226, 227, 48 A.L.R. 243:

There the action for damages was against a prominent physician who was charged with negligence, wilfulness and wantonness in failing to properly protect the finger of the plaintiff when he treated it with x-ray to remove warts, whereby it was severely burned, requiring long treatment and deforming plaintiff and partially incapacitating her. It was also alleged that the finger was subjected to the x-ray for too long

---

3. Perhaps, in this day and time, the rule is ripe for change; particularly with insurance so readily available to protect the corpus of the charity from depletion by a large judgment. In any event, such change is far outside the province or power of this Court. Cf. Gibbs, How Does The Federal Judge Determine What Is The Law Of The State?, 17 S.C.L.Rev. 487, 492, 493 (1965).

4. Some would say that the hospital has "climate of endowment" furnished by the taxpayer, but the "consideration" flows from the child's father's contract of enlistment. Dependent hospital care is a recognized "fringe benefit" of his employment as a soldier (airman).

a period of time * * *. In the course of the opinion it was said:

"This suit was based upon certain specific acts of the defendant, alleged to be negligent, willful, and wanton. No attack was made upon, nor does this action involve, his general skill, competency, ability, or reputation. *A physician might be ever so skillful or competent in a general way, or might have an unexcelled reputation, and yet be guilty of the grossest negligence in his treatment of a particular case.*" [Emphasis supplied.]

The question involving the standard of care due this particular plaintiff by defendant will be discussed after a closer scrutiny of the facts applicable thereto as this Court finds them.[5] These facts are to be considered in the light of plaintiff's contention that defendant was negligent in permitting a Hospital Corps Wave, who had just completed working in various hospital wards, including a pediatrics clinic where there were sick and well children, to be assigned to, including the handling of this premature infant, the Premature Nursery without a physical examination, including taking of nose or throat cultures. Secondly, if such was negligence, does the evidence support a finding that the infant was cross-infected by the Hospital Corps Wave with the same strain of staphylococcus, and hence, that the resulting damage to the child was the proximate cause of such negligence?

Corps Wave Derteen completed training at the hospital corps school which was conducted by the United States Navy at the Great Lakes Naval Center on October 20, 1961, and departed therefrom on that date and reported for duty to the Charleston Naval Hospital on October 23, 1961, at which time she was assigned to the

Newborn Nursery. The last week and a half of her duty at Great Lakes consisted of working in the various wards of the hospital with sick persons including those who were infected and running fevers. The last area in which she worked there was the pediatrics clinic wherein there were both sick and well children, immediately prior to her departing for her duty in Charleston. She received a routine physical examination prior to leaving the Naval Center, but no cultures were taken.

Upon reporting to Charleston she was asked by her superiors of the wards and areas in which she worked prior to coming to Charleston and advised them that she had worked in the pediatrics clinic. Despite this she was given no physical examination of any kind nor was she cultured, and she was assigned to the Newborn Nursery.

At the time of the birth of the infant plaintiff, the Corps Wave was still assigned to the Newborn Nursery and was placed in attendance upon plaintiff who was in the Premature Nursery.

She continued during her eight hour shift in attendance, though it was not at all frequent, or even necessarily daily, upon plaintiff from the time that it was placed in the Premature Nursery in an isolette on November 14th up to and including November 26th, on which date she delivered the child to the x-ray room in the pediatrics ward and handled the child while taking it out of the isolette.[6] The government, in denying negligence and causal relation, says that there is no evidence that Corps Wave Derteen actually handled the child prior to the 26th. On the 26th, of course, the child was already infected. Nevertheless, the government's Answer to Interrogatories in accordance with Rule 33, Fed.Rules Civ.Pro., filed June 28, 1963, stated:

5. Karen Greb Derteen in the course of her professional duties had

---

5. The historical facts recited here are to be considered as "facts (found) specially" in accordance with Rule 52 (a), Fed.Rules of Civil Pro.

6. It is abundantly clear from the testimony that Corps Waves were prohibited, un-

der the Premature Nursery Regulations, from handling or ministering to premature infants of plaintiff's age and development.

occasion to change the diapers of Rayne Francine Kapuschinsky and possibly feed her; however, the dates and times of such handling cannot be determined to any degree of definiteness.

Other testimony by Corps Wave Derteen revealed:

Q And you did testify that the Navy investigated in February of 1962, is that correct?

A Nodded affirmatively.

Q And when you were testifying there I believe you said that when we got the Kapuschinsky baby its legs were all right.

A Well, you could see the way it moved around in the incubator and it would kick its legs and everything.

Q And you said, you know how if you pick the baby up to change its diapers and put your hands between its legs, towards the end he would cry when you touched his legs?

A Yes, sir.[7]

\* \* \* \* \* \*

Q Describe to the Court how you changed a diaper on a baby weighing 2 lbs. 15¼ ozs.?

A You just pick it up by its heels and slip a diaper underneath it.

\* \* \* \* \* \*

Q What did you do for the children in the isolettes?

A Well, the one baby was out of the isolette that was in the Premature Nursery. It was in a crib and the other one was in an incubator and we would *feed them* and *change them.*

The following extracts from the testimony of the Corps Wave and Lt. Cmdr. Barry, the Registered Nurse, demonstrate the practice of the personnel in the Premature Nursery when they were busy.

*Corps Wave Derteen*

Q (By Mr. Cabaniss) Mrs. Derteen, in the course of your duties in the nursery did you administer to all three children in the Premature Nursery?

A If the Registered Nurse was *busy* and the Kapuschinsky baby had a dirty diaper I imagine I lifted the baby up and slipped the diaper under it but I could not say for sure.

*Lt. Cmdr. Dorothy Barry*

Q Well, suppose she was *busy,* wouldn't somebody else—one of the corpswomen do it?

A They aren't—we are supposed to, sir?

Q Would they do it, the corpswomen?

A If you were *busy.* [Emphasis supplied.]

The only reasonable inference for this Court is that at some critical time, before November 26th, Corps Wave Derteen did in fact handle the child.

Nose and throat cultures taken from Corps Wave Derteen on November 28th revealed that she had staphylococcus aureous coagulese positive in or upon her person. Other Nursery personnel were cultured and it was determined that she was the only one infected.

Next to be determined is whether or not the two organisms were the same. Doctor Finklea testified that there was no report to the effect that the Corps Wave and the baby had the same strain of what is commonly referred to as "Hospital Staph." Indeed, he stated that the Corps Wave's strain specifically was not coagulese positive. This conclusion is not borne out by the evidence before the Court. Dr. Donald E. Dore, the hospital pathologist in charge of laboratory examinations and determinations with respect to both plaintiff and the Corps Wave stated:

Q And they are both staphylococcus aureous coagulation positive, is that correct?

A Yes, sir.

---

7. The Court, in making a determination regarding whether or not she actually handled the child, considers it significant that she remembered the sensitivity of the child's legs.

The "staph" from the child and the Corps Wave was not phage[8] typed because of alleged unavailability of that type testing in the area in 1961. The phage test would conclusively show whether or not the organisms were the same. Instead, sensitivity tests (antibiograms) were given which reflect relative sensitivity to certain drugs. As the Court pointed out in Helman v. Sacred Heart Hospital, 62 Wash.2d 136, 381 P.2d 605, 96 A.L.R.2d 1193, 1198:

> The antibiogram sensitivity test is employed to ascertain which particular antibiotic chemical substances may be used to combat a bacteria infection. In this sensitivity test, cultures are made under ideal environmental conditions in the laboratory from staphylococci contained in bodily substances or drainage, and are induced to grow profusely in colonies. Discs impregnated with antibiotic medicines are placed in close contact with these colonies of cultured bacteria. From the reaction of the colonies to the different discs, the scientist can estimate the degree of sensitivity of the bacteria to a specific antibiotic substance. Inhibitions of growth and rate of growth are the determinants. Sensitivity is graded from Nos. 1 to 4, with No. 1 indicating the greater sensitivity and No. 4 the smaller. From the antibiogram, the treating physician can ascertain the particular antibiotic medicine he will prescribe. This test is regularly employed in all large hospitals * * *.

Using the procedure used in Helman, supra, to graphically show the sensitivity of the two cultures taken, the following appears:

| | Kapuschinsky Left Hip 11–26–61 | Karen Greb (Derteen) Nose and Throat 11–28–61 |
|---|---|---|
| Aureomycin | o | x |
| Penicillin | o | o |
| Chloromycetin | x | x |
| Polymycin B | o | o |
| Terramycin | o | x |
| Erythromycin | o | o |
| Tetracycline | o | x |
| Di Streptomycin | o | o |
| Furadantin | x | x |

The zeros indicate a completely negative reaction and the x's indicate a positive reaction.

Reference to the foregoing will reflect that the infant plaintiff's culture was sensitive to two antibiotics and that the Corps Wave's culture was sensitive to five, two of which were the same two to which the infant was sensitive.[9] Keeping in mind that plaintiff has the burden of proof, does this mean that the two strains were different?

The Court concludes that they were not different. Doctor Dore, the hospital pathologist, testified as follows, after dis-

8. "The phage test * * * is a * * * sophisticated and precise method for identifying the strains of staphylococcus aureous coagulese positive. Phage is another name for virus. Phages are viruses (that) * * * breed in bacteria. Peculiar to them is the characteristic that they attack staphylococci organisms causing them to dissolve or melt away. By applying these known phages or viruses to the strains of staphylococci sought to be identified, a definitive result is obtained with such preciseness as to warrant giving the identification a classification number. So standardized has the phage test become, that the results in identifying the strains * * * will be reported to the investigator by their phage numbers." Helman v. Sacred Heart Hospital, infra, 381 P.2d at p. 608, 96 A.L.R.2d at p. 1199. It appears that phage type 80/81 is most often the culprit.

9. The bare mathematical disparity of sensitivity of one culture to two drugs and the other to five is not enough, in itself, to close the door to plaintiff, particularly when one considers that the sensitivity test is designed for therapy, not necessarily identification. The Court must be guided by the experts. Again, the discussion in Helman, supra, 381 P. 2d 605, 96 A.L.R.2d at pp. 1200–1202 is helpful thereabout.

cussing the results of the Corps Wave's culture:

Q Now, doctor, that same organism that the Kapuschinsky child was diagnosed as having, is that correct?

A It is the same type organism, staphylococcus aureus.

Q Is there any difference that you can detect from your tests?

A The only difference I see here is that the organism grown from the throat was sensitive to more antibiotics than the one from the Kapuschinsky child.

Q Now, was there anyone else that you tested at about that period on the hospital staff who had this same staphylococcus aureus?

A Not to my knowledge.

\* \* \* \* \* \*

Q Doctor, the fact that the culture on Miss Greb (Corps Wave) and the culture on the Kapuschinsky child were different insofar as their response to antibiotics were concerned, would not mean that they were not the same strain would it?

A I don't think you could say definitely that they were or were not the same strain.

Q And they are both staphylococcus aureus coagulation positive, is that correct?

A Yes, sir.

Dr. Peter Dineen, a New York surgeon who was not familiar with the standards of care in the Charleston area, but who had several years specialized experience in microbiology and who had written papers on the problems of "Hospital Staph" was asked:

Q Assuming a child is born at the U. S. Naval Hospital, Charleston, South Carolina, on November 14, 1961, weighing 2 pounds 14 ounces, and is placed in an isolette in the premature nursery at the hospital, and on November 26th the infant was recorded as having a temperature of 101 degrees, and a bulging in the area of both hip joints, and an in-

cision was made in each hip and grossly purulent material was removed, and a culture taken from this material was found to contain staphylococcus aureus, sensitive to chloromycetin and furadantin; and, assume, further, that the child had been handled by a hospital corps woman on one or more occasions between November 14 and November 26, and that a nose culture taken from this corps woman on November 28th was found to contain staphylococcus aureus, sensitive to aureomycin, chloromycetin, terramycin, tetracyclin and furadantin; and, further, assume that there were no known infections of hospital inpatients involving staphylococcus aureus, and that nose or throat cultures taken from other personnel handling the infant were negative as to staphylococcus aureus—assuming the above facts, do you have an opinion with reasonable medical certainty as to the source or cause of the infant's infection?

MR. YOUNG: (Counsel for Government) We object to the form of the question on the ground that it contains facts not in evidence; namely that the child was handled on one or more occasions by the corps woman in question.

Q What is your answer, Doctor?

A Yes, I do.

Q What is your opinion?

A My opinion, with reasonable medical certainty, assuming the facts in the question presented to me is that the child—the infant—was infected by the organism carried by the hospital corps woman, and that this bacteria had subsequently caused the infection in both hip joints.

■■ As for the objection made by the government in this deposition testimony, in light of the finding by this Court that there was "contact" between the Corps Wave and the child, the objection can be properly overruled. The fact that Doctor Dineen is not familiar with

the medical practices in the Charleston area would not be a bar to his testifying as to medical cause and effect, or identity of the organisms. "A medical expert may be asked to give the court the benefit of his medical knowledge so far as it may be relevant and material to an issue before the court * * *." Thornton v. Victory Carriers, Inc., 338 F.2d 959, 961 (4th Cir. 1964). This is not a case in which the expert is giving an opinion founded upon the opinion of another expert; it is clear that the evidence, as presented, was correctly stated in the hypothetical question.[10] This Court recognizes that the question propounded asked for "cause and effect," but similarity of identity of the strains was necessarily grounded upon a consideration of the sensitivity tests. Moreover, the Court is impressed by the fact that the government has not shown that the organism is different, only that there was a variance as to sensitivity as outlined.[11]

As to whether or not the "contact" found between the infant plaintiff and the Corps Wave is relevant as a factor in determining transmission of the "staph" to the child, the following testimony by Doctor Dore, the hospital pathologist, is applicable:

Q Now, Doctor, this case involves a bacteria staphylococcus. Could you describe that bacteria, tell us something about it?

A Staphylococcus that is a gram positive cocci, it is coagulation positive and usually pathogenic.

Q That is commonly referred to as hospital staph is it not?

A That is correct.

Q Now, is this bacteria infectious?

A Yes.

Q How can it be transmitted from person to person?

A It can be transmitted, well it can be transmitted through wounds, through any break in the skin; can be transmitted by droplet transmission. In other words, if someone coughs, it can be spread through the air that way.

Q *Can it be spread by the breath of someone having the organism?*

A *It could.*

Q *What about direct touch by hand?*

A *It could.*

Q Now, is this a dangerous organism of the human body?

A Yes, it is.

Q Now, Doctor, that same organism that the Kapuschinsky child was diagnosed as having, is that correct?

A It is the same type organism, staphylococcus aureus.

Q Is there any difference that you can detect from your tests?

A The only difference I see here is that the organism grown from the throat was sensitive to more antibiotics than the one from the Kapuschinsky child.

Q. Now, was there anyone else that you tested at about that period on the hospital staff who had this same staphylococcus aureus?

A Not to my knowledge.

Q Now, would a premature child be more susceptible to this infection than a larger child or an adult?

A Yes, I think so. I am not a pediatrician, but I think that is *fairly common knowledge* premature infants are more susceptible.

Q To any type infection, isn't that correct? The staphylococcus infection has reached epidemic proportions in nurseries in various hospitals has it not?

A That's right.

Q *And that is fairly common knowledge isn't it?*

A *Yes, sir.*

---

10. Note Ellis v. Kansas City Life Ins. Co., 187 S.C. 334, 197 S.E. 398, and 9 S.C.L.Q. No. 4A, p. 15 (1957).

11. See note 9, supra.

Q Now, did you, or your Department, run any tests on Karen Greb prior to the test on November 28, 1961?

A Not to my knowledge we didn't.

Q She could then have had this staphylococcus infection for some time prior to the test on November 28, 1961?

A That's right.

Q Could she have had it for *as much as two weeks before that?*

A *Yes.*

Q *And if a test had been run during that period very probably it would have shown that she had this staphylococcus infection?*

A *Probably would have.*

Q And if it had shown she had this infection, then she probably wouldn't have been allowed to work in the nursery, is that correct?

A Well that wouldn't have been for me to say. That would have been up to the Chief of that Department to say. I wouldn't think that he would.

Q *And the child could have contracted this infection from someone with the infection, touching, or breathing on the child, is that correct?*

A *It could have.*

Q Assuming, Doctor, that Karen Greb did have this staphylococcus aureus organism at the time she was handling the child in the isolette, wouldn't it be your opinion that is probably where the child contracted the infection?

A I don't think you could really assume that.

Q *But certainly that is one way she could have gotten it?*

A *That is one way the child could have gotten it, if it was handled by Greb.*

Q And your laboratory had the facilities and personnel for doing the test properly did it not?

A Yes, sir.

Q *So if you had made routine tests of personnel you would have a much better chance of picking up any carriers than you would if you didn't make the tests, is that correct?*

A *Yes, sir, that is true.* [Emphasis supplied]

■ There is a further abundance of testimony that the "staph" can be transmitted in a multitude of ways, some of which are not even known. The fact that all the possibilities are unknown at this time is not a bar to decision, Estes v. State of Texas, 381 U.S. 532, 541, 85 S.Ct. 1628, 14 L.Ed.2d 543, for there is certainly enough known, and enough evidence thereabout, for an adjudication to be made during plaintiff's figurative "day in Court."

■ It is clear that there is no direct evidence, as opposed to circumstantial evidence, upon which to make a determination of the identity of the strain, or the method of actual transmittal to the child. Nevertheless, circumstantial evidence is competent to show both. Chaney v. Burgess, 246 S.C. 261, 143 S.E.2d 521; Horton v. Greyhound Corp., 241 S.C. 430, 128 S.E.2d 776, 780.

■■ Surely plaintiff would not be denied recovery on the basis that the government did not use the sophisticated phage test to determine exactly which strain of staph appeared in the two cultures.[12] This Court sitting as a trier of fact, finds plaintiff's evidence rational and persuasive.[13] Though the

---

12. As a further example of proof of plaintiff's case, the expert opinion of Doctor Dineen was that the strain of the culprit organism was the same despite the differing resistance to antibiotics of the two cultures, because when the organism "passes from one individual, who is a carrier, to a second individual who develops a clinical infection,—the organism frequently becomes resistant to more antibiotics. *In the absence of phage typing, this would not change my opinion.*" See the text accompanying notes 9 and 11, supra.

13. See Helman v. Sacred Heart Hospital, supra, 381 P.2d 605, 96 A.L.R.2d at 1202.

evidence is circumstantial, this does not mean it must be conclusive beyond a reasonable doubt. Eickhoff v. Beard-Laney, Inc., 199 S.C. 500, 20 S.E.2d 153, 156, 141 A.L.R. 1010. The legal burden upon plaintiff does not become more onerous because the evidence is circumstantial, though the "burden of persuasion" is necessarily more difficult.

As to the transmittal of the organism to the plaintiff being proved by circumstantial evidence, the same reasoning applies. In the nature of things there can be no direct evidence here. Even with some of the well known "social diseases," the transmittal from the "contact" (which is often vigorously denied) can only be shown circumstantially. The mere fact of infection is not enough to open the door to the awarding of damages, but when the admitted direct evidence is considered in light of the different means of transmittal about which all the doctors testified, then it can be seen that plaintiff has met the burden of proof.

The doctrine of res ipsa loquitur is not being applied in reaching the above conclusions regarding circumstantial evidence. First of all this doctrine does not obtain in South Carolina, secondly, it supplies an evidentiary assist which plaintiff does not need.

From the above it can be seen that a causal relation has been established by plaintiff between the government's acts or omissions and plaintiff's injury in the sense of the guidelines set forth in Gunnels v. Roach, 243 S.C. 248, 133 S.E.2d 757, 759. Remaining to be discussed is the question of whether or not such constitutes negligence as a matter of law.

It goes without saying that "[a]ccidents happen for which no man is to blame," State of Louisiana ex rel. Francis v. Resweber, 329 U.S. 459, 462, 67 S. Ct. 374, 375, 91 L.Ed. 422, and the fact of injury, in and of itself, even absent explanation, does not necessarily mean that a party has been guilty of negligence. As was stated at the beginning of this opinion, the essential elements of proof must be met before recovery can be had.

The whole question regarding negligence revolves around a determination of whether or not the government breached its duty by permitting the Corps Wave to come in "critical contact" with plaintiff under all the circumstances known and appearing. In other words, did the government breach its duty by permitting the Corps Wave to come in "critical contact" with plaintiff without giving her a physical examination, including throat cultures, before assigning her to work in the Premature Nursery, or before permitting her to come in contact with this particular plaintiff, with full knowledge of plaintiff's condition and susceptibility to infection?

Was the standard of care maintained and urged by the government such that everything reasonable and prudent was done to obviate danger to plaintiff? If so, there is no liability. The government cites the rule expressed in Garfield Memorial Hospital v. Marshall, 92 App.D.C. 234, 204 F.2d 721, 37 A.L.R.2d 1270:

> In general it is the duty of a private hospital to give a patient such reasonable care and attention as the patient's known condition requires. This duty is measured by the degree of care, skill and diligence customarily exercised by hospitals generally in the community, and by the express or implied contract with the patient.

204 F.2d at page 725. On the same page that the Court refers to the "community standard" it notes that "consideration (should be given) to modern learning."

From South Carolina authority it can be inferred that at least the "community" standard would obtain. In discussing a *malpractice* case against a dentist, the Court stated that he was "bound to possess and exercise that degree of skill and learning which is ordinarily possessed and exercised by members of his profession in good standing in the same general neighborhood or in similar localities." Bessinger v. DeLoach, 230 S.C. 1, 94 S.E. 2d 3, 6. From this discussion by the South Carolina Court, it would seem that the "community" is not necessarily re-

stricted to the geographical area in proximity to the alleged tortfeasor, but would extend to other locales similarly situated. As one Court stated, "the essential factor is knowledge of similarity of conditions; geographical proximity is only one factor to be considered." United States v. Cannon, 217 F.2d 70, 73 (9th Cir. 1954). Plaintiff urges a "national standard" because "hospital administrators and physicians study from text books of national prominence, and * * * it is possible to maintain standards of like quality throughout the nation * * *." Citing Appleman, "Hospital Liability for Act of Non-salaried Staff Physician," 1964 Personal Injury Annual p. 189.

The argument for application of a "national standard" has efficacy here because, among other reasons, the Naval Hospital at the time in question, and apparently at present, was accredited by The Joint Commission on Accreditation of Hospitals,[14] though there is no evidence in the record that the other hospitals, about which testimony was taken, were similarly accredited. However, it is not even necessary to go beyond the Charleston area here, though it seems that in a negligence, as opposed to malpractice, action against a hospital, "national standards" are relevant. Duling v. Bluefield Sanitarium, Inc., W.Va., 142 S.E.2d 754, 765.

 As to the standard to apply here, resort must be had to the expert testimony. Plaintiff placed upon the stand a local general practitioner,[15] Dr. Jefferson M. Flowers, Jr., who is on the staff of Baker Hospital, which has approximately 50 beds, in Charleston. The Court attempted to limit his testimony at first because he was not a specialist, but changed its opinion when shown that specialization only went to the question

of weight of the testimony, not competency. He testified as follows:

Q And what standards are required by Baker Hospital for personnel working in the nursery and particularly with regard to any particular premature babies?

A No nurse can be brought from another floor where infections or infectious diseases are treated to work in any of the critical areas which are: The nursery, the surgery, the delivery room. And all new personnel are examined thoroughly prior to being put in the nursery.

Q Now, what about a nurses aide or nurse who had worked in a gynecology ward from another hospital, would she be permitted to work in the nursery?

A She could not be brought straight in, no sir. There again you have the problem of infectious diseases that actually it all boils down to the staph infection. Any possible contact with staph infection can produce carriers. That is the reason you don't bring them off another floor in your own hospital to work in the nursery.

Q Would you be able to place one in the nursery if she had been given a culture test and determined she was free from staphylococcus infection?

A After a period of time, I wouldn't take a nurse from another floor if we were shorthanded on obstetrics and do a culture and put her in the nursery. I mean, the situation is this: You have got to have a period of time to get your cultures back and she has got to stay away from all infectious diseases during this period.

14. This joint commission is composed of the American College of Physicians, American College of Surgeons, American Hospital Association, and the American Medical Association.

15. The Court recognizes the difficulty plaintiff had in obtaining local specialists to testify. Judicial notice will be taken

of the well recognized reluctance of members of the medical profession to testify in cases of this type. See Lewis v. Read, 80 N.J.Super. 148, 193 A.2d 255, 266, and Prosser on Torts (2nd Ed. 1955) p. 134. Some plaintiffs' lawyers call this a "conspiracy of silence," though that characterization seems a bit strong.

Q ˙If you had a hospital woman who had worked in a large general hospital and she had worked in a ward with gynecology patients and she had also worked in the pediatric clinic treating both sick and well patients, would the standard medical practice at Baker Hospital permit her to be placed directly into the newborn nursery when she arrived to work at Baker?

A No, sir.

Q And would this be a standard medical practice in the community?

A That is the standard medical practice, as far as I know, in the community.

Q Let me ask you this. Why would —I think this may be repetitious but why would you not put her into the nursery after she had come from such a place?

A Because there is the possibility of the business of getting contagious diseases, especially staph infection, in the nursery where the newborns and prematures, of course, are most susceptible to it.

Dr. B. Owen Ravenel, who is on the staff of St. Francis Hospital, the Medical College Hospital, Director of Pediatrics at Roger Hospital, and associate clinical professor of Pediatrics at the Medical College of South Carolina was called by the government to testify. The main point he established for his proponent was that periodic culturing of nursery personnel was not the practice at the hospitals in the Charleston area, but he acknowledged that it had been done some few years back, then abandoned. However, he agreed on direct examination that "all personnel assigned to the newborn infant service, or formula room, should have a pre-employment * * * physical examination * * *."

When asked substantially the same hypothetical question asked Doctor Dineen of New York, see text preceding note 10, supra, Doctor Ravenel indicated in substance that a person being transferred from one hospital to another should not be precluded from work in a newborn nursery for a period of time, and that reasonable medical ˙ practice ˙ in the Charleston area during the time in question did not require nose or throat cultures before assignments being made to the newborn nursery.˙

Doctor Ravenel, whose fine reputation and skill are well known, noted that the practice in Roper Hospital, which at the time had approximately 350 beds, was for registered nurses, practical nurses, and nurses aides to attend to premature infants. He stated:

I'm not too sure about which are aides and which are practical nurses; I'll be frank with you there. I know the ones that we get up there are darn good and they do a mighty good job with ˙the babies. They are well trained to take care of the newborn babies as well as the prematures.

As to whether or not it constituted negligence, under all the circumstances, to place the Corps Wave in the premature nursery after she worked ˙in the pediatrics section of the hospital from which she was transferred, it would seem that the following colloquy on cross-examination is relevant:

Q * * * And you try to have as skilled personnel as you can working with premature children?˙

A Yes.

Q And all the ones that you say that you have either are the ones who normally work in pediatrics—

A ˙ Now, we don't take any out of pediatrics—

Q You don't take any of them out of pediatrics?

A To put them in the nursery because they would have been coming out of a contaminated area into the nursery.

Q So it wouldn't be a good practice to take somebody from the pediatric ward and put them in the nursery?

A Not unless it was an emergency when you had to have somebody.

From this, one can see that the only real difference between the testimony of Doctor Flowers and Doctor Ravenel is that Doctor Flowers would demand a culture before allowing a nurses aide to work in the nursery. They both agree that there should be a pre-employment physical examination, though there is some difference as to how extensive it must be. They both agree it is not good practice to bring someone from the pediatrics section of a hospital and place them in proximity to premature infants. They agree that only well-trained personnel should be assigned to work with premature infants. That is precisely the point at issue here.

Logically, what is the practical difference between transferring from a pediatrics section of a hospital to the nursery of that hospital, and transferring from a pediatrics section in one hospital to another hospital's nursery? The distinction is one in which no court should be asked to indulge.

The procedures followed at the Medical College of South Carolina Hospital in Charleston were covered in the testimony of Dr. John R. Paul, Jr., Chief of the Department of Pediatrics at the Medical College. His testimony has given the Court great concern.

Q Now with regard to the testing at the Medical College Hospital, did I understand that at one time there was testing (culturing), routine testing of the personnel in that nursery?

A This was put into practice before I took over charge of the service.

Q But it was a practice before you took over?

A Yes.

Q And then, as you said, you forbade this particular practice?

A Yes.

Q And it is possible to have someone who is asymptomatic [16] but who is a carrier of staphylococcus infection?

A Yes.

Q And it is also possible for somebody who is an asymptomatic carrier to transmit the disease to someone else?

A Certainly it is possible, but they would have to try very hard to do it.

Q But it can be done?

A It can be done, yes.

Q And you would prefer not to know whether you had such a carrier on the staff in the nursery?

A Right.

Q Because if you knew about it, it might upset whether you were able to assign these people or not?

A It would make it impossible for us to run the nursery.

Q So you feel that it is better simply to be in ignorance as to whether you have carriers working in your nursery?

A Yes.

Q You don't think it would be better to have this knowledge and then make a determination based upon the other qualifications of the person and whether they had any other signs of disease?

A We found that it interferes very seriously. Now we are very alert to other signs of disease.

Q But as far as having an asymptomatic carrier, you just prefer not to know it?

A We prefer not to know it. That is absolutely correct.

Doctor Paul's testimony is anomalous. He agrees that premature infants are extremely vulnerable to infection, that they require for their very survival the highest degree of care, that an asymptomatic

16. "Asymptomatic" refers to the person who presents no subjective evidence of disease. For example, an "asymptomatic carrier" could unknowingly harbor and spread a disease, transmitting the patho- genic organisms by whatever means they ordinarily communicate from one person to another. History's most well-known "asymptomatic carrier" was known as "Typhoid Mary."

carrier of hospital staph could infect them. Yet he stated:

Q But as far as having an asymptomatic carrier you would prefer just not to know it?

A We prefer not to know it. That is absolutely correct.[17]

Plaintiff argues that the practices in force in 1961 at the Medical College Hospital fall within the recognized legal principle of being no standard at all, or if in fact really practiced, to be standards of negligence.

Plaintiff urges that the Court adopt the reasoning expressed in Darling v. Charleston Community Memorial Hospital, 50 Ill.App.2d 253, 200 N.E.2d 149, 179:

Conformity with the standard of care observed by other hospitals in good standing in the same community cannot necessarily in itself be availed of as a defense in a negligence action where criterion relied upon is shown to constitute negligence, in that it fails to guard against injuries to the patient in failure to meet standards of care self imposed or established.

Also pressed is the reasoning in Favalora v. Aetna Casualty and Surety Co., La.App., 144 So.2d 544, 551 where a Louisiana Court held:

To relieve a member of the medical profession from liability for injury to a patient on the ground that he followed a degree or standard of care practiced by others in the same locality is, in our opinion, unthinkable when the degree or standard of care in question is shown to constitute negligence because it fails to meet the test of reasonable care and

diligence required by the medical profession. To hold otherwise is to exempt one from even wilful negligence on the patently unsound ground that others in the same profession do likewise. * * * Stated otherwise, we deem it unsound to hold that immunity may be based on failure to take a known precaution for the safety and welfare of a patient on the ground that others in the same profession follow a similar course.

This is a good law, and the general principles expressed therein are unassailable, Bridger v. Asheville & Spartanburg R. Co., 25 S.C. 24, 30, supra, n. 15., however, it is unnecessary to go that far for purposes of this decision.

The thrust of the government's defense is that plaintiff cannot prevail because the Naval Hospital followed the standards obtaining in the Charleston area. A review and analysis of all the evidence discloses that such contention is not only without merit, but to the contrary, the evidence as to the prevailing local standards, which are in fact standards, which have a bearing on the particular issue herein involved gives added support to plaintiff's assertion that the Naval Hospital was in fact negligent and failed in and breached its duty to this particular child.

In focus are the particular activities of defendant in respect to this particular child, concerning the particular Corps Wave. For as this Court noted initially quoting from Bessinger v. DeLoach, supra:

A physician might be ever so skillful or competent in a general way, or might have an unexcelled

---

17. As Dean Prosser said: "[I]t may be negligence * * * to proceed in conscious ignorance in the face of an obvious risk." Prosser on Torts (2nd Ed. 1955) p. 132. The government's proffer of the testimony accompanying this and the preceding footnote brings to mind Chief Justice Simpson's words in Bridger v. Asheville & Spartanburg R. Co., 25 S.C. 24, 30:

Humanity has seldom been found to be perfect, * * * (but) it would not do to say that a man can shield himself from a negligent act, resulting in injury, by proving that prudent and reasonable men have done the same act. Such a doctrine would legalize the baldest act of negligence.

reputation, and yet be guilty of the grossest negligence in his treatment of a *particular* case. [Emphasis supplied.]

What was the standard of care owed to this particular plaintiff in November 1961? A distillation of all the probative testimony, relevant to the issue here, would show the following standard applicable to a premature infant in plaintiff's condition:

1. Only highly experienced personnel would minister to plaintiff's needs; and

2. Someone who had worked in a section of the hospital, or in another hospital of area, wherein contagion was prevalent would not be permitted to work in the premature nursery in proximity to plaintiff without a complete physical examination, this to include appropriate laboratory tests [18] to determine if such persons are asymptomatic carriers.

Surely the foregoing is not an extraordinary standard, when one considers the extraordinary danger, and it mirrors the reasonable and prudent standard in the Charleston area in November 1961.

 It is firmly established in our law that "(t)he more probable the danger the greater the need of caution." MacPherson v. Buick Motor Co., 217 N.Y. 382, 389, 111 N.E. 1050, L.R.A.1916F, 696, Ann.Cas.1916C, 440. The Naval Hospital recognized the great dangers to immature premature infants in their rules and regulations when they forbade the inexperienced Corps Wave to handle plaintiff.[19] It is clear that violation of a rule or regulation designed to promote the safety of patients in a hospital, or more· explicitly, this plaintiff, may be considered negligence, if the violation proximately resulted in the injury of which complaint is made. Tidwell v. Columbia Ry., Gas & Electric Co., 109 S.C. 34, 95 S.E. 109. As Judge Sobeloff noted appropriately in Smith v. United States, 336 F.2d 165, 171 (4th Cir. 1964): "Ignoring naval specifications cannot be justified simply because they had been ignored in the past without harmful consequence." In any event, this self-imposed rule established no higher standard than that which prevailed in the local community.

 The government was remiss in its duty to plaintiff in two respects, either one of which is sufficient to sustain a cause of action for negligence: (1) It permitted an inexperienced Corps Wave to come in "critical contact" with plaintiff whose susceptibility to infection was well known, in violation of proper medical standards; and (2) It permitted this "critical contact" without a complete physical examination of the Corps Wave, including appropriate laboratory tests, *before* she began· to work in the Premature Nursery. Each of these failures resulted in the communication of the pathogenic organism to plaintiff who was severely injured and deformed thereby; and but for these acts or omissions, plaintiff would not have been injured.

Plaintiff's ad damnum asks damages in the amount of $300,000. With the amount of injury shown, the Court faces the question of whether the demand is reasonable. The facts picture a defendant who has been unusually careful and alert to minimize damages.[20]

Liability is established, but the Court determines that further argument is necessary on the issue of damages. Accord-

---

18. Because there is a "respectable minority of the medical profession" which does not recommend periodic culturing of nursery personnel, Baldor v. Rogers, Fla., 81 So. 2d 658, 55 A.L.R.2d 453, *periodic* culturing cannot be said to be the standard.

19. See note 6, supra.

20. Perhaps the Court should note the remarks made in 1890 by Mr. Justice Miller in In re Neagle, 135 U.S. 1, 59, 10 S.Ct. 658, 666, 34 L.Ed. 55, where he said:

It has in modern times become more apparent that the physical health of the community is more efficiently promoted by hygenic and preventive means than by the skill which is applied to the cure of disease after it has become fully developed.

ingly, counsel will be notified by the Clerk when a hearing is scheduled.

The Clerk will make the appropriate entry.

And it is so ordered.