## GOOGE v. UNITED STATES.
### Civ. No. 9376.

United States District Court
E. D. New York.
Dec. 28, 1951.

---

Bertram Bakerman, New York City, (William L. Standard, and Louis R. Harolds, New York City, of counsel), for plaintiff.

Frank J. Parker, U. S. Atty., Brooklyn, N. Y. (Irving P. Kartell, Asst. U. S. Atty., Brooklyn, N. Y., of counsel), for defendant.

BYERS, District Judge.

The plaintiff sues under the Federal Tort Claims Act to recover $100,000 damages for personal injuries sustained on January 5, 1948, as the result of his jumping out of a fourth floor window in the United States Marine Hospital at Neponsit, Queens County, New York, as the aftermath of a four days alcoholic debauch while out of the hospital on a three days' pass.

He was originally admitted as a tubercular patient on November 14, 1947, received proper treatment, and made such progress that by December 30th his sputum was negative. This appeared in the testi-

mony, is not in issue, and is not included in the findings.

He suffered multiple fractures and other injuries as the result of his fall which was of 37 feet onto a concrete ventilator.

As the consequence of extended further hospitalization, surgical and medical care at various government hospitals, he was physically rehabilitated, and finally discharged on December 23, 1949, as fit for limited duty. Since then he has filled odd jobs, and taken a course of training as a barber, but says that his hand is not steady enough for that calling.

The plaintiff's theory is that, when he was brought back to the Neponsit hospital on January 4, 1948, he was suffering from delirium tremens to the knowledge of the doctor who then examined him; that the condition involved such a showing of mental disturbance that he should have been treated as a psychiatric patient, i. e., either placed under constant supervision, or else promptly sent to an institution equipped to deal with persons in that mental state who threaten to do harm to themselves or others. That the care and attention which he received at the Neponsit hospital was not up to the standard prevailing in general hospitals, as the result of which his act in seeking to escape by jumping from the window must be deemed to have resulted from the negligence of those in charge of this institution and of this plaintiff, and thus that the defendant must answer to him in damages.

Since the applicable substantive law is that of New York, the case of Robertson v. Charles B. Towns Hospital, 178 App.Div. 285, 165 N.Y.S. 17, is relied upon by the plaintiff; there an alcoholic addict, while deranged, jumped out of a window.

■ In discussing the measure of duty resting upon a private sanitarium receiving and treating alcoholic patients, the language is, "to use reasonable care and diligence not only in treating but in safeguarding a patient, measured by the capacity of the patient to provide for his own safety. In the discharge of this duty, physicians and nurses possessing that reasonable degree of learning and skill that is ordinarily possessed by persons similarly engaged must be employed, and they must act with reasonable care and diligence * * *.

"We think the evidence recited presents a question for the jury as to whether the physician or the nurse should not, in the exercise of the requisite skill and care, have foreseen such a casualty and protected the decedent from the unguarded window in the bathroom."

Thus the issue is one of fact which this Court must decide, based upon a consideration of the present evidence which involves a hospital for tubercular patients, not alcoholic addicts. That process yields the following:

### Findings.

1. The plaintiff, James Googe, then about twenty-three years of age, and a seaman, was admitted to the United States Marine Hospital, then at Neponsit, New York, as an ambulatory tubercular patient, on November 14, 1947.

2. His history on admission contains the following:

"*Habits:* Alcohol, periodic excess—whiskey."

"*Neuro—Misc.:* No abnormal motions, paralysis or sensory changes. Occasional 'shakes' after drinking episodes."

3. He was placed on "bed rest" in the hospital, being allowed "up to the bathroom once a day in a wheel chair" during this period. He was told at the end of one month that he could expect further improvement if the bed rest were to be maintained for an additional like period.

4. On December 30, 1947, he requested a pass to leave the hospital, ostensibly to collect money said to be owing to him. The ward surgeon at first dissuaded him, but the request was renewed later on that day, and a three days' pass was granted by that official, and an admonition given to plaintiff as to his own responsibility for continuing the treatment that had helped him thus far.

Plaintiff left the hospital, and joined a companion in downtown Manhattan, [and a course of drinking whiskey and beer for

the next three days was pursued, with intervals, apparently, for only two or three meals. During some or all of this time the plaintiff occupied a room in the Hotel Lincoln, which room adjoined that of his companion; he progressively indulged in drinking.] Matter in brackets a rumor, not embodied in this finding.

5. By January 2, 1948, the plaintiff was in such a state of debility from intoxication that he felt too indisposed to return to the hospital before the expiration of his pass at noon of that day. He telephoned to the ward surgeon explaining "that he felt very bad, and did not know if he could get back to the hospital right away". He was told to return as soon as he could.

6. The history of January 3, 1948, is not sufficiently established in the plaintiff's case to permit of a finding, although it is believed that he was treated for intoxication by a hotel physician, and that others there employed observed his conduct. No such person was called as a witness.

7. At about 11:00 a. m. January 4, 1948, Dr. Griffith, an intern at the Neponsit hospital, received a telephone call from the plaintiff's drinking companion, to the effect that the plaintiff was and had been extremely ill, and unconscious for about twenty-four hours. The doctor told his informant to try to arrange with the Marine Hospital at Hudson and Jay Streets, Manhattan, to provide an ambulance to transport plaintiff to the Neponsit hospital; this was accomplished, and the plaintiff arrived at the latter about 2:20 p. m., accompanied by his said companion.

8. The plaintiff on arrival was "far from unconscious; he was babbling incoherently."

9. The history given by the companion to Dr. Griffith as noted by him was: "Met patient on 12/31/47 (a day later than he left the hospital) and proceeded to drink together until on 1/3/47 (sic, actually 1948) patient began to get severe shakes and feel ill. Then at 4 p. m. 1/3/47 (sic) saw L. M. O. (local medical officer?) who over about 24 hours gave patient 3 hypos and 6 (what resemble seconal capsules) (Note two such seem to have been then delivered by the companion to Dr. Griffith) caused patient to become unconscious."

10. The plaintiff was put in his regular bed in the ward known as 4 (floor) west.

11. That ward contained about 35 patients, some four or five of whom were accommodated on a sleeping porch. There was one graduate nurse in charge, who was assisted by not less than two male orderlies.

12. A screen was placed around the plaintiff's bed, and sedation was administered, i. e., thiamin chloride, and ascorbic acid, and thiamin, and glucose was introduced into his veins to fortify the blood stream.

13. The treatment of the patient, on this reception into the hospital, is not criticized by plaintiff's expert, and is found to have been proper.

14. During the ensuing half hour the plaintiff was crying out, complaining of fears as to the treatment being administered, asking for his wallet (which his companion had taken for safe-keeping), and was so noisy as to disturb other patients in the ward.

15. He was then moved into private room #20 on the same floor of the hospital; additional sedation was administered, and the intern ordered "restraint if necessary and side-boards to bed".

16. At 7:30 p. m. the plaintiff was given 12 cc of paraldehyde, which was repeated at 1:30 a. m. January 5, 1948, under the same intern's orders.

17. During the evening of January 4th, the intern visited plaintiff in his room, who was sitting in a chair beside his bed, the side-boards having been taken down by the patient. He refused to return to his bed, so the doctor put him back, replaced and fixed the side-boards, and administered paraldehyde, this being one of the two occasions referred to in the foregoing finding.

18. At 1:30 a. m. on January 5th, the night nurse's notes indicate that the plaintiff had been noisy and getting out of bed. That nurse has not been identified, nor was she called as a witness.

19. During the same night an orderly was observed to be in the room of the plaintiff.

20. When the day ward nurse came on duty on January 5th at 7:00 a. m., the plaintiff was observed by her to be sleeping, and the side-boards were in place on his bed.

21. Room 20 was about 10' x 9', equipped with a bed, table and chair, and contained one unbarred window, the sill of which was about 2½ feet above the floor; the window was approximately 5 feet high, 2½ feet wide, and had top and bottom frames so that but half of the window area could be open at any time. There was an outside window screen, held in place by an exterior fastening.

22. About 7:45 a. m. on January 5th, the ward nurse awakened the plaintiff to give him nourishment. He was "very stuporous"; cereal and coffee were fed to him by an orderly.

23. At 8:30 a. m. the patient was observed to have climbed over the side-boards, and gotten out of bed. An orderly, who was so notified, came to the room and provided a wheel chair and took plaintiff to the bathroom, but the plaintiff did not make any use of the toilet facilities. On his way to the bathroom the patient was rambling in speech; on arrival there he got out of his chair and sat on the radiator; he then opened the window in that room, and the orderly closed it; this was twice repeated.

The orderly said to the patient: "You may want the window open, but other patients do not." Also he said: "Why don't you behave yourself, and get back to your room?" On conflicting testimony, it is found that the plaintiff did not then threaten or announce his purpose to jump out of the window.

24. The plaintiff at this time was restless, argumentative and his ideas were not coordinated, but there is no evidence that he was turbulent or that he assumed a threatening attitude in any physical sense.

25. The plaintiff was wheeled back to his bed by the orderly, who was accompanied by the same nurse; he was placed in bed after the side-boards were loosened.

He resisted that "a little". The plaintiff complained to the nurse of glass in his foot. His foot was examined with negative results, but there was a broken ash tray on the floor near a table, which the orderly swept up and removed. When the latter left the room, the nurse was present, and the orderly covered the plaintiff when he was in bed, and he "seemed calm".

At this time the nurse told the patient to stay in bed, and said there was no one to stay with him and get him into bed every time he got out; the patient replied: "Why is everyone criticizing him (me) when they gave him (me) so much dope over there?" (Assumed reference to experience at Hotel Lincoln) The nurse answered that it was needed to keep him quiet.

These incidents consumed approximately 20 minutes, from 8:25 a. m. to 8:45 a. m.

26. The nurse then left the room, having observed that the plaintiff was lying in bed quiet, and had asked for a cigarette; also he was complaining of a blister on his heel.

27. The nurse had other duties with reference to preparing medication for patients, and there were too few orderlies on duty to enable her to assign one to stay in the plaintiff's room.

28. At about 9:00 a. m. she saw the intern on duty and asked if the plaintiff "could be given a sedation now", and the intern replied that he would prefer to have the ward surgeon see the patient.

29. This suggestion by the nurse was deemed to be a wise precaution since she had no other nurse to depend on, and she thought that under sedation the patient wouldn't get out of bed.

30. At about 9:15 a. m. the plaintiff, being alone in his room, managed to open the said window and jump out, falling approximately 37 feet, and sustained the injuries earlier referred to.

31. Upon the conflicting opinions of plaintiff's expert, Dr. Houck, a qualified physician who has specialized in neuropsychiatry and who did not see this plaintiff until long after January 4, 1948, and Dr. J. Edwin Griffith, Jr., who was the intern to whom reference has been made, and who observed and professionally treated

the plaintiff on his arrival at the hospital on January 4, 1948; treated him, and observed him on at least three other occasions during that evening and night, the finding is that the plaintiff was not suffering from delirium tremens on January 4th or 5th, 1948. He was suffering from what is colloquially known as "an acute hang-over" complicated by his having been treated with barbiturates while in the course of his stay (probably on January 3, 1948) at the Hotel Lincoln in New York, by a doctor not called as a witness by the plaintiff.

32. "Shakes" means the laymen's conception of (a) early delirium tremens, or (b) delirium tremens themselves, or (c) a marked hang-over effect after an alcoholic debauch.

33. It cannot be said that, after a given individual has been drunk as here related, he gets delirium tremens. It is a matter of individual tolerance, and depends upon his state of nutrition, how much he has been eating along with his drinking, and the amount consumed.

34. A period of observation was required in this case to enable the attending physician to make an accurate diagnosis of the plaintiff's malady, and 24 hours, beginning January 4, 1948, at 2:30 p. m., was not too long a time for this purpose.

35. During that interval it was the duty of those in charge of the Neponsit hospital to use reasonable care and diligence in treating and safeguarding the plaintiff as a tubercular patient who had temporarily left the hospital and who returned obviously suffering from an alcoholic debauch concerning the details of which those in charge of the hospital received but scant information.

36. The plaintiff has not sustained his burden of proof that the defendant, through the instrumentality of the Neponsit hospital, was negligent in its treatment of him as a patient in the hospital between January 4, 1948, at 2:30 p. m. and January 5, 1948, at 9:30 a. m.

## Conclusion of law.

The defendant is entitled to judgment against the plaintiff, with costs.

## Comment.

The question of fact within the case of Robertson v. Charles B. Towns Hospital, supra, has been resolved as stated, in obedience to the following appraisal of the evidence:

This plaintiff was not being admitted to a sanitarium as an alcoholic addict, as was the plaintiff's decedent in the cited case. He was therefore not in a position to visit upon the responsible authorities of the Neponsit hospital that measure of responsibility which would have attached to those in charge of the Alcoholic Ward at Bellevue Hospital, for instance, had he been received there.

Incidentally, the only troublesome aspect of this case is the failure of the Neponsit doctor to insist upon the plaintiff's being sent to Bellevue upon receipt of the telephone message from the plaintiff's companion during the morning of January 4, 1948. In explanation, the testimony of Dr. Lang, the Neponsit Director, indicates that as many as 25 patients a month returned in his hospital from brief outings in various stages of intoxication, and that not to exceed five of such persons, during the second half of 1947, were mentally disturbed. From this it seems that experience had tended to vindicate the course that was followed in this case; also, that until a patient can be subject to a reasonable period of observation, no exact diagnosis of his condition can be ventured.

The only source of information, concerning this plaintiff's conduct while absent from the hospital, was imparted by his companion, who had evidently weathered the drinking spell better than the former, but even his report that the patient was unconscious at the time, was not borne out when arrival at the hospital was accomplished.

The argument for the plaintiff is that he was clearly deranged mentally and should have at once been transferred to an institution for mental cases. This rests

in part upon his record on original admission, concerning his "occasional 'shakes' after drinking episodes" (Finding 2). The definition of the latter (Finding 33 )is taken from the testimony of plaintiff's expert, and can denote "a marked hang-over effect". True, in any condition of intoxication there is an interference with, and sometimes an obliteration of mental control, but as the testimony shows and human experience teaches, the scope of derangement varies with the patient; it is a question of degree. Probably nothing is more personal to an individual than his own bodily chemistry.

This means that the plaintiff's stated proclivity did not teach the intern who first treated him on January 4, 1948, that he was a victim of delirium tremens, nor does the evidence point to a subsequent development of that condition.

There was no formal diagnosis recorded on January 4, 1948, which was consistent with a tentative state of mind by the doctor then on duty.

The cases cited by the plaintiff have been consulted, but do not point to the necessary course of this decision: Santos v. Unity Hospital, 301 N.Y. 153, 93 N.E.2d 574, had to do with a patient who was received into the hospital to accomplish a special purpose, i. e., maternity; she jumped out of a window while temporarily unattended, being a victim of a rare condition known as *Intrapartum Psychosis.*

Volk v. City of New York, 284 N.Y. 279, 30 N.E.2d 596. A nurse partook of spoiled medicine improperly in the medicine cabinet; again a special duty seems to have been violated.

Daley v. New York, 273 App.Div. 552, 78 N.Y.S.2d 584. This was a case of a mental patient readmitted as such, who was a victim of dementia praecox—paranoid type. The absence of an attendant for such a patient led to the disaster which was visited upon the City. Clearly a specific duty was undertaken toward that patient. Dow v. New York, 183 Misc. 674, 50 N.Y. S.2d 342, is a like case, as was also Martindale v. State of New York, 269 N.Y. 554, 199 N.E. 667.

This plaintiff was not a mental patient in any true sense; he had temporarily put his faculties into alcoholic suspense, and the depth of the surrender was not apparent, as has been said.

The plaintiff also urges Reck v. Pacific-Atlantic S. S. Co., 2 Cir., 180 F.2d 866. If that case is understood, the decision assumes that plaintiff was indeed in delirium tremens when he came to his injury, to the knowledge of the mate who gave him phenobarbital "to quiet his nerves". This dosage was once repeated and the ship's carpenter was assigned "to guard him, to stay in his room with him and see that he did not harm himself. * * * The mate wanted to put him in irons, but the union delegate objected on the ground that they might hurt him." Thereafter, while plaintiff appeared to be sleeping, he was left unattended, and came to his injury for which recovery was had. If that case is an authority concerning the requirements resting upon this hospital under the circumstances disclosed, I am much mistaken. Incidentally the Court there said that, even though the watch was changing when the plaintiff left his room, the carpenter "could have obtained relief for a moment". A like availability of assistance is not shown to have been present in the Neponsit hospital at 9–9:15 A.M. in Ward 4 W with its 35 patients.

Moreover, here there was no conflict in judgment as that case shows, between the mate and the union delegate. Fortunately thus far union delegates have not been encouraged to overrule responsible hospital officials in the treatment of those needing institutional care.

 Decision was reserved concerning an offer by plaintiff of some of the record of an investigation made on January 6, 1948, in the Neponsit hospital, by Dr. Lang, the Clinical Director, into all the attendant circumstances of plaintiff's treatment and care on the two days in question. The specific offer had to do with what was said at that hearing by the plaintiff's drinking companion, one Loughlin, now deceased. The record has been examined, and appears to be a report on Form 93, promulgated by

the Bureau of the Budget, to which many sheets are attached. This indicates that it was part of Dr. Lang's duty to conduct the inquiry and to submit the report. I think it was admissible within Pekelis v. Transcontinental & Western Air, Inc., 2 Cir., 187 F.2d 122, and the objection, if to the report as a whole, is overruled. As to the statement of Loughlin, it is of little or no evidential value, for the reasons assigned by defendant's trial counsel. No reliance is had by this Court on his statement, and it is deemed to have been excluded from the report; nor was it of moment in any persuasive sense.

That which the nurse and other witnesses stated has been freely consulted, since this is a case in which the exact facts can best be gathered from a formal statement of recollection made within two days of the occurrence, by those in a position to observe. Nor had those witnesses any reason to color their narratives.

From all of which, it results that there must be judgment for the defendant, with costs.