Robert Frank STEEVES, a Minor by his Guardian ad Litem, Ruth A. Steeves, Plaintiff,

v.

UNITED STATES of America, Defendant.

Civ. A. Nos. 67–256, 67–6.

United States District Court
D. South Carolina,
Charleston Division.

Oct. 31, 1968.

As Amended Nov. 15, 1968.

Ellis I. Kahn, Charleston, S. C., for plaintiff.

Klyde Robinson, U. S. Atty. for the District of South Carolina, Columbia, S. C., and Thomas P. Simpson, Asst. U. S. Atty., Charleston, S. C., for defendant.

## ORDER

HEMPHILL, District Judge.

Action under the Federal Torts Claims Act, 28 U.S.C. § 1346(b) is brought for damages alleged to have resulted from the negligence of defendant.

Complaint alleges that plaintiff is a dependent of a member of the Armed Forces of the United States and is/was entitled to medical treatment at the medical facilities of the United States. The essence of the remainder of complaint is that defendant's servants and agents were negligent in diagnosis and treatment of appendicitis. As a result of this negligence plaintiff's appendix ruptured causing toxic matter to be diffused about the intestines of plaintiff resulting in the forming of adhesions and permanent damage. Plaintiff, it is alleged, was further damaged because of shock to his nerves and mental anguish, resulting from further operative procedures causing susceptibility to other illnesses. It is also alleged that he is unable to perform his usual duties and his abilities to work, play and enjoy life have been imperiled. A companion complaint was filed by parents of plaintiff, Robert Frank Steeves.[1] This complaint re-alleges the causative features of Robert Frank Steeves' complaint and further alleges that they have in the past supported plaintiff and will continue to do so in the future; but, as a result of the alleged negligence of defendant, Robert Frank Steeves, can no longer render or perform work and services for plaintiffs and they have also been deprived of his comfort, companionship and happiness. It is also asserted that they will be required to spend future monies for tutoring, medical and surgical attendants, as well as other expenses. Also plaintiff, Ruth A. Steeves, was initially forced to retire from her job to care for her child. Defendant, United States Government, entered as a defense, a general denial of all allegations of both complaints except the first, second and third paragraphs.

This matter was heard by the court without a jury on March 11th and 12th, 1968. Pursuant to Rule 52(a) of Federal Rules of Civil Procedure, this court finds and separately states its findings of fact and conclusions of law.

## FINDINGS OF FACT

1. On July 20, 1966, eleven year old Robert F. Steeves, an Air Force dependent entitled to medical care at Government hospitals, began complaining of pain in his abdomen at approximately 6:30 p. m. He laid down for a while and later began vomiting. At approximately 11:00 p. m. his mother called the Air Force Dispensary, which is a hospital without facilities for major surgery, and was told to watch him for fever and bring him in the next day. On the 21st day of July he continued to complain of severe pain and cramps in his right side and stomach and his mother took him to the Dispensary at approximately 3:00 p. m. where he was examined by Dr. David C. Mullins. Doctor Mullins observed that the child's temperature was 98.6°. His abdomen was soft with generalized tenderness and with more intense point tenderness in the right lower quadrant. There was rebound tenderness in the right lower quadrant and in the right upper quadrant, but the pain in the right upper quadrant was not

---

1. The cases were joined for trial.

"referred." Bowel sounds were active. Rectal examination showed tenderness on the left side. Doctor Mullins ordered lab tests which included the following findings:

Blood Tests: White blood count: 13,200. Differential count: Neutrophiles, 89; Bands, 4; Lymphocytes, 7; Hematocrit 40%; Hemoglobin 13.4.

2. Doctor Mullins told the child's mother that the blood test showed a high white count indicating a possibility of appendicitis. He then wrote out a consultation sheet, SF513, and told Mrs. Steeves to take him to the Emergency Room at the U. S. Naval Hospital. Doctor Mullins then had a call placed to the Naval Hospital to inform them that he was sending over a case of possible acute appendicitis. The consultation sheet read as follows:

This is an 11 year old white male with two day history of nausea and vomiting without diarrhea, but with a temperature of 102° last week, then did well, except for general letheragy until yesterday when he began vomiting (times ten) and ran a high subjective temperature. Examination: Abdomen right lower quadrant tenderness with point tenderness and rebound. Bowel sounds, active. Rectal— left side tenderness. White blood count was 13,200 with 89 Polys and 7 lymphs. Urinalysis—within normal limits except moderate amount of occult blood.

3. Additionally, he indicated his provisional diagnosis as "possible appendicitis," checked it as an "emergency" and then for screening purposes addressed the consultation to "EOR—General Surgery." His reason for the latter was:

So that when the corpsman who screens the patients sees that it has got general surgery there, well, he won't have an internal medicine specialist or a pediatrician in this case look at the child, but rather will call a surgeon.

4. They arrived at the Emergency Room at approximately 4:30 p. m. and were seen by Dr. William S. McAfee. He read the referral sheet from the Air Force Dispensary and asked the child where he felt pain. Bobby told him in his side and stomach and pointed. Doctor McAfee ran no lab tests nor did he order x-rays.

His observations on the SF513 were as follows:

Temperature was 101.2° orally, abdomen, tender, right slight, decreasing on the left. No rebound. Rectal, not increasing tenderness left or right. Chest clear. 1. clear fluids only. 2. record temperature every four hours; 3. return if temperature increases to 103° or pain worsens. 4. check in A.M. unless all is well. (He was discharged from the Emergency Room at 5:02 p. m.)

The emergency treatment report at the Naval Hospital, hospital form 6HD, was as follows:

The chief complaint was possible acute appendicitis, see Standard Form 513. Physical findings: Temperature 101.2°. Abdomen tender with hyperbowel sounds. Point tenderness on the right. No rebound, rigidity, little guarding. Rectal negative for specific tenderness. Impression: Not a surgical abdomen. * * *

5. The evidence is in conflict on the issue of whether or not consultation was asked for by Mrs. Steeves. The court finds that consultation was sought but refused. Further, Dr. McAfee failed to record a history to substantiate his difference of opinion with Doctor Mullins, did not think it appropriate to consult a surgeon who was on call, nor did he consult with Doctor Mullins by telephone, although these procedures could have been easily accomplished.

6. Upon returning home, Mrs. Steeves called the Air Force Dispensary and was told not to give Bobby any medication because it might cloud the picture. She was instructed to record his temperature and pains and take him back to the Naval Hospital if the pain became worse or the temperature went over 103°.

Bobby stayed in bed all evening and dozed off and on. His temperature would reach 103°, break, and would be followed by chills. He complained of abdominal pain, but not any worse than he previously had.

At approximately 1:00 a. m. on the morning of July 22, Bobby started crying and rolling around. He requested that he be taken back to the doctor. His legs had pulled up into a knot because of the pain and he could not straighten them out. Everytime Mrs. Steeves would move the child's legs, he screamed. She and her daughter placed him in the car and returned him to the Emergency Room of the Naval Hospital. While they were driving over there, the bumps caused by the automobile going over railroad tracks caused additional pain. At approximately 2:30 a. m. on July 22nd, after waiting for awhile, the child was seen by Dr. E. J. Voltolina,[2] an intern. Doctor Voltolina came in, asked Bobby how he felt and where he hurt. Bobby had to be helped onto the examining table. Doctor Voltolina pressed on his abdomen a few times and told the child that he had gastroenteritis, and it was nothing to worry about because it was common and not dangerous. Mrs. Steeves gave a history and told how the child had acted at approximately 1.00 a. m. and again asked if the "night surgeon" could see the child. This request was refused. Mrs. Steeves said that she could not take the child home in that condition and in that much pain. Doctor Voltolina then gave Bobby a shot. Mrs. Steeves told him of the instructions she had received from the Air Force Dispensary about medication "clouding the picture." Doctor Voltolina said this would not change anything and he administered to the child .3 mgs of atropine sulphate. He ordered no lab tests or x-rays despite the fact that over eleven hours had passed since the tests were made at the Air Force Dispensary.

7. The Emergency Room treatment report for this visit shows:

Chief complaint, 101°, nausea. Was in previously today for possible appendicitis. Physical findings, temperature 99.2°. Patient's temperature decreased consistently since yesterday. Abdomen negative in all respects except slight generalized tenderness. Rectal negative. Impression: Gastroenteritis; Atropine sulphate, .3mgs IM. Sent to Dispensary for follow up on GI disorder. Left at 0300 hours.

8. Bobby was completely asleep by the time he reached home due to the combined effects of the shot and his condition. He did not awaken until approximately 11:00 a. m. Mrs. Steeves took him back to the Air Force Dispensary that afternoon, July 22. At approximately 3:00 p. m. he was seen by Doctor Mullins, the same doctor who had seen him the previous afternoon. The mother related the two visits to the Emergency Room and stated that at approximately 1:00 a. m. that the child complained of the pain becoming suddenly worse. During the morning of July 22, he continued to have right lower quadrant cramping, abdominal pain, nausea and temperature. He had no more vomiting. He had no bowel movement since the evening of July 19, 1966, and had not urinated since July 21. The examination which Doctor Mullins conducted did not appear to show any substantial difference than that of the afternoon before. He continued to have right lower quadrant tenderness and point tenderness with guarding and generalized muscular spasms, but no masses. Bowel sounds at this time were absent. Temperature was 98.2° orally. Rectal examination revealed no tenderness and results of the laboratory tests were as follows:

White blood count; 22,500; Differential count; neutrophiles 86; Bands: 11, lymphocytes 4; eosinophiles 2; hematocrit 39; hemoglobin 12.7. The results of a urinalysis were as follows:

2. Doctor Voltolina had only recently completed his formal medical education 30 days prior to examining Bobby.

Color-appearance, yellow, clear; reaction-acid; specific gravity 1.018; albumin negative; sugar negative; acitone moderate amount; occult blood, small amount; microscopic remarks 6 to 8 white blood cells per high power field, 4 to 6 red blood cells per high power field.

9. He was admitted to the ward at the Dispensary for additional laboratory tests and observation. The urine culture revealed the following: Over 50,000 colonies of E. Coli. Blood urea nitrogen and total bilirubin reflected the following: BUN 12 mgs; bilirubin, total less than 1.2 mgs percent.

At approximately 11:00 p. m. the child was seen on the ward at the Dispensary by Dr. Allen G. Edwards, who reviewed his clinical record and upon examination of his abdomen felt that the child had acute appendicitis. He again sent him to the Emergency Room at the U. S. Naval Hospital with the following notation: "Please do not let this child's appendix rupture."

After interminable delays at the Emergency Room, the child was put to bed at 2:10 a. m. Before he was put to bed, it was observed in the Emergency Room that the child manifested the following physical findings:

Decreased bowel sounds, guarding, point tenderness and slight rebound, right lower quadrant. Impression: possible appendicitis.

When Robert Steeves was admitted to the Naval Hospital, among other things, it was observed that an analysis of blood revealed 17,300 white blood cells, 95 neutrophiles, 5% lymphocytes, hematocrit 40, and hemoglobin 14.5. Surgery began at 10:28 a. m. on July 23, 1966.

10. Under general anesthesia, a right lower quadrant incision was made and the appendix was found to be ruptured. There was a considerable amount of pus in the right gutter as well as in the pelvis. This was aspirated by means of a vacuum device. The abdominal cavity was irrigated with large amounts of a saline solution, and two Penrose drains were left in and exteriorized through the wound. Approximately 500 cc of pus, perhaps more, was removed from Bobby's abdomen at the time of the operation. The pus was "free flowing" and it continued to drain thereafter for several weeks.

A secondary closure of the wound was required and subsequently performed on August 13, 1966. While the procedure was being performed, Doctor Amra told Bobby that, "it was going to be a sloppy job because he did not have the right thread and needles." This statement was never denied, and in fact seemed to be substantiated by the fact that a few months after discharge from the hospital the wound did herniate.

11. Following a discharge from the hospital on August 19, 1966, the child was weak, lethargic, and did not eat well. He only went to school for half-days for the first three weeks. The hernia evidenced itself in October 1966, and a repair was accomplished at Scott Air Force Base, Illinois, during November 1966. The child was in the hospital for 2½ weeks, and he missed approximately one month of school thereafter.

12. Stanley S. Schlosberg, M.D., a gastroenterologist and Assistant Clinical Professor in Medicine at U.C.L.A. for the past twelve years, conducted an extensive evaluation of Bobby Steeves. Among other things, he concluded that as a result of the peritonitis the child had a permanent pathological change within his abdomen, taking the form of intestinal adhesions or scars, a fibrous formation on the smooth tissues of the abdomen. Additionally, he stated that Bobby would experience periodic pain, discomfort and shortness of breath in the presence of exertion. The adhesions may cause varying degrees of obstruction.[3]

3. Dr. Harold Neal Bass, a Government doctor, examined the child shortly before trial. He expressed the opinion that there were no adhesions present in the child's abdomen, and that he was completely normal. The physical examination which

He related that:

The symptoms of gas and the pains, the stomach aches in his abdomen may be intermittent the rest of his life. I think the biggest danger over a long period is the possibility of true intestinal obstruction, a complete obstruction. Some of these cramps or stomach aches may be partial obstructions that relieve themselves from interference with the bowel's normal motion, but the big danger to this young man is that he is a good candidate for developing complete obstruction, which would be a life-threatening situation.

Doctor Schlosberg explained that the excessive gas is indicative of a sub-conscious air swallowing to relieve inter-abdominal discomfort. Even though over a year and a half has passed since the incident involving the appendix, he expressed the opinion that he would expect the child's stamina to improve with the additional passage of time, providing there was no recurring serious difficulty. He expressed the opinion that there was a permanent emotional scar from the events which gave rise to this suit as well, although he did expect that the young man would make a certain amount of adjustment.

13. Using standard criteria published by the American Medical Association,[4] Doctor Schlosberg expressed the opinion that young Robert Steeves has a 5% permanent impairment of the whole person. Aside from this permanent impairment he was asked about the probability of obstruction absolutely and compared with others in the population he stated that Bobby's chances were 10 times greater of having some kind of obstruction. Statistically, he has a 5% probability of experiencing some obstruction.

14. Testimony of the plaintiff is that he gets tired and winded if he plays hard. He also experiences nausea. He wakes up tired and often has the stomach ache. He further indicated that he had had difficulty with his school work and at the time of trial, was not passing. Mrs. Steeves corroborated this testimony and added that an emotional change had occurred which resulted in nightmares, depressive periods, and communication problem with adults. She stated that these conditions did not exist before Bobby's operation.

15. Based on the probable length of time between the rupture and the operation, the amount of pus found, the post operative care and the post operative condition of Bobby Steeves, the court finds and concludes that plaintiff did suffer peritonitis, greater than localized peritonitis, from which formed abdominal adhesions. This would result in a 5% permanent disability on the whole person. It was Stuart Schwartzchild, Ph.D., an actuarial expert's opinion, based on the race, sex and completion of college, that Bobby Steeves is within the class of persons who would earn $413,-496.00 during their lifetime.

16. The court finds that the plaintiff, Bobby Reeves, pursuant to Section 26–12 of South Carolina Code, has a life expectancy of 56.80 years and 49.46 from the reaching of his majority.

17. Plaintiffs Ruth Steeves and Frank E. Steeves have lost some services of their son as well as suffered other expenses.

18. Any of the foregoing findings of fact which may constitute conclusions of

---

he gave the plaintiff took 20 minutes. On cross-examination he admitted that much of the symptomatology present could be consistent with a diagnosis of adhesions in the abdomen.

Dr. Amra, who performed the operation on Bobby, related that he encountered large amounts of pus. He stated that this was localized in the right gutter, and that as far as he could tell from the

small incision made, he encountered only localized peritonitis. This pus was located in the right paracolic gutter and in the pelvis. He did not believe there was generalized peritonitis. He did admit that it was "free flowing."

4. Guides to the Evaluation of Permanent Impairment, the Digestive System, 188 Journal A.M.A. pp. 159–171 (April 13, 1964), Plaintiff's Exhibit No. 4.

law is/are hereby adopted as conclusions of law.

## CONCLUSIONS OF LAW

A. This court has jurisdiction of the parties and subject matter of this action.

■ B. The burden of proof of negligence and proximate cause in a malpractice case are on the plaintiff. Bessinger v. De Loach, 230 S.C. 1, 94 S.E. 2d 3 (1956).

■ A physician is bound to use reasonable care in the treatment of his patient and the rendering of professional services. However, he is bound only to possess and exercise that degree of skill and learning which is ordinarily possessed and exercised by members of his profession who are in good standing and live in the general neighborhood or in a similar locality.

■■ C. The law is settled that a wrong diagnosis will not of itself support a verdict in a malpractice suit. De Zon v. American President Lines, Ltd., 318 U.S. 660, 63 S.Ct. 814, 87 L.Ed. 1065 (1943); Pearce v. United States, 236 F.Supp. 431 (W.D.Okl.1964). However, a physician must use ordinary care in reaching his diagnosis. Hicks v. United States, 368 F.2d 626 (4th Cir. 1966).

■ Therefore, "in order to fasten liability in a malpractice case, it is necessary that the plaintiff prove, by a preponderance of the evidence that:

(1) the recognized standard of medical care in the community which would be exercised by physicians in the same specialty under similar circumstances, and

(2) the physician departed from that standard in his treatment of the plaintiff."

Price v. Neyland, 115 U.S.App.D.C. 355 320 F.2d 674, 99 A.L.R.2d 1391 (1963).

■ For liability to attach for a mistake or error in judgment there must be a failure to comply with a recognized standard of medical care which would be exercised by similar physician under similar circumstances. *Price*, supra.

D. The facts reveal essentially three areas in which the issue of negligence is thrust upon the court. Initially, the first issue is whether failure on the part of Doctors McAfee and Voltolina to call for consultation in light of the facts of this case amounted to a failure to exercise due care and a failure to comply with the recognized standards of medical care. Secondly, in light of the medical signs observed, was it a breach of standard medical practice not to immediately intervene surgically? Third issue of negligence is whether the child should have remained in the hospital for observation, especially in view of the diagnosis of Dr. Mullins.

■■ Basic to any discussion of due care and breach of medical standards are certain established principles. One of these principles is that a child is owed a greater duty of care by a hospital than is an adult. Kapuschinsky v. United States, 248 F.Supp. 732 (D.S.C.1966). Also when appendicitis is suspected the only adequate remedy is surgery, and it is dangerous to delay too long because of the consequences of a rupture. Therefore it is much better to remove a sound appendix than it would be to delay and allow gangrene and rupture. Rogers v. United States, 216 F.Supp. 1 (S.D.Ohio 1963); aff'd 334 F.2d 931 (6th Cir.). A further premise is that "a greater degree of diligence and care, to be as certain as the circumstances and conditions surrounding the case will permit, is imposed upon a physician in making a diagnosis where other competent and reputable physicians have previously made a positive diagnosis in direct conflict with that of the physician in question." 41 Am.Jur., Physicians & Surgeons § 92, at 210.

With these guiding principles in mind, the evidence points only to negligence and lack of due care on the part of defendant. This is graphically demonstrated in the failure on the part of Dr. McAfee and Dr. Voltolina to seek consultation.

E. Dr. Mullins stated that after his initial examination he felt that the child should have been examined within a few hours by a surgeon. That is why he put "E.O.R. General Surgery" on the patient's referral sheet, for the purpose of putting "general surgery" on the card is so a surgeon would see him instead of a pediatrician or an internal medicine specialist.

The importance of consultation, in light of the facts in this case, is very important. The first physician who examined the child in the Emergency Room at the U. S. Naval Hospital when he arrived at approximately 4:30 in the afternoon was an ear, nose and throat doctor. The second examining physician had been an intern for only one month. They did not deem it necessary to obtain consultation from a surgeon, even though the referral sheet made reference to same, as noted above. Both are members of the American Medical Association which has established medical standards in its "Principals of Medical Ethics," and Section 8 thereof provides:

A physician should seek consultation upon request; in doubtful or difficult cases; or whenever it appears that the quality of medical service may be enhanced thereby.

In the defendant's Answer to plaintiff's Second Interrogatories, No. 9, the Government states that the following is found in the Manual of the Medical Department: "In complicated cases, the medical officer shall provide for consultation with other officers of the medical corps of the Navy present concerning diagnosis, treatment, and patient management." The doctor in charge of the Emergency Room also stated that consultations were encouraged.

In the Standards for Hospital Accreditation published by the Joint Commission on Accreditation of Hospitals of which the U. S. Naval Hospital is a member, published in December, 1965, on Page 6 thereof, the following is found:

*Essentials of Consultation*: A satisfactory consultation included examination of the patient in the record, a written opinion signed by the consultant must be included in the medical record. When operative procedures are involved, the consultation note, except in emergency, shall be recorded prior to operation.

*Responsibility in requesting consultation*: The patient's physician is responsible for requesting consultation when indicated. It is the duty of the hospital staff through its chief of service and executive committee to make certain that members of the staff do not fail in the matter of calling consultants as needed.

Additionally, the Explanatory Supplement to the Standards for Hospital Accreditation, published January, 1964, provides as follows on page 14:

In all instances in which the second physician makes a careful study of the problem presented by the client, the consultation should be formalized by a note on the records. * * *

[A] Consultation is not complete or satisfactory unless it includes an examination of the patient and the patient's record and a written opinion signed by the consultant and attached to the record.

Inextricably tied up with the subject of "consultation" is that of "supervision," which will be briefly discussed next. This concerns the intern who was on duty in 'the Emergency Room. As was noted before, he had been an intern for only one month. The regulations [5] in effect at the Naval Hospital provide:

*Responsibility*

A. Interns shall be assistants to, but not substitute for any watch officer. They shall, as such, handle emergencies, and any clinical work assigned.

---

5. NAVHOSPCHASNINST 1601.13B, Sec. 3, entitled "The Intern Watch."

If the intern concerned is capable with dealing with the emergency, he should be allowed to do so *under competent supervision.* (Emphasis supplied).

\*   \*   \*   \*   \*   \*

D. Interns shall perform after normal working hours under the supervision of the Office of the Day, JOOD, the OBGYN watch, medical watch, or surgical watch, respectively. \* \* \*

There was no supervision of Doctor Voltolina evident.

Plaintiff's expert, Dr. Gerald Weiss, testified that Dr. McAfee, on initially seeing plaintiff in the emergency room, should have sought consultation. This opinion is bottomed on the fact that patient involved was a child who suffered abdominal pain, tenderness, temperature and who had a preliminary diagnosis of appendicitis. There was further failure on the part of Dr. McAfee in not discussing with Dr. Mullins the reasons for Dr. Mullins' diagnosis of appendicitis. Dr. Voltolina's failure, upon his later examination of plaintiff, to seek consultation only contributed, amplified and aggravated Bobby's ultimate condition. Dr. Weiss was of the opinion that failure to call a specialist was a breach of good medical practice which proximately contributed to plaintiff's injury.

As was stated in *Kapuschinsky,* supra, 248 F.Supp. at 748, violation of a rule or regulation which is designed primarily for safety of hospital patients will constitute negligence if this violation proximately results in the injury.[6]

F. The court finds as a matter of law that failure to keep plaintiff for a period of observation and failure to perform further laboratory tests was a breach of good medical practice. If the physicians at the Emergency Room had done everything that ought to be done concerning diagnosis, and still concluded that the child did not have acute appendicitis, it was patently a breach of good medical practice not to admit him to the hospital to make observations relative to his condition over a period of time in light of the referral diagnosis.

Because of the nature of the disease, if diagnosis was uncertain, observation by personnel trained in the art of looking for significant signs, or changes in signs, was essential.

As was said in Hicks v. United States, 368 F.2d 626, "Only if a patient is adequately examined, is there no liability for an erroneous diagnosis."[7] In Googe v. United States, 101 F.Supp. 830 (E.D.N.Y.1951), the court noted that a period of observation is sometimes required to make an accurate diagnosis of plaintiff's illness.

Plaintiff's expert, Dr. Weiss, testified that inspection is necessary in any proper diagnosis of a child. By inspection he meant observation and gaining the child's confidence. The reason for this is that a child does not always understand what is going on and his reaction may confuse the medical picture, therefore, repeated examinations are necessary. If repeated home visits could be made, Dr. Weiss testified that this would be sufficient, otherwise, hospitalization would be necessary. He testified further that it was a breach of good medical practice, when possible appendicitis had already been diagnosed, not to observe the child, preferably in the hospital.

In *Hicks,* supra, quoting from Kelly v. Carroll, 36 Wash.2d 482, 494, 219 P. 2d 79, 86, 19 A.L.R.2d 1174 (1950), cert. den. 340 U.S. 892, 71 S.Ct. 208, 95 L.Ed. 646, the court found approval with the following: "If there was a possibility it was appendicitis he

---

6. See also Burris v. Texaco, Inc., 361 F. 2d 169, 172 (4th Cir. 1966); Tidwell v. Columbia Ry., Gas & Electric Co., 109 S.C. 34, 95 S.E. 109.

7. See footnote 1 in Hicks which states generally that a physician has a duty to use all diagnostic aids in order to establish a firm basis for diagnosis and treatment.

(defendant) had no right to gamble with (decedent's) life, on the theory that it might be something else."

From this the court concludes, without discussing whether there should have been an immediate operation, that failure on the part of defendants to seek consultation and keep plaintiff for observation in light of Dr. Mullins' diagnosis of appendicitis, was a breach of good medical practice, negligence and the proximate cause of the rupture of plaintiff's appendix and resulting damage.

■ G. In considering damages suffered by plaintiff, it is quite clear that impairment to future earning capacity is a necessary and proper element of damages and the fact that one is unemployed at the time of injury does not deprive one of the right to such damages, Matthews v. Porter, 239 S.C. 620, 124 S.E.2d 321. "The fact that there may be difficulty in determining, does not prevent the granting of such relief where damages with reasonable certainty and probability will follow." Winchester v. United Ins. Co., 231 S.C. 483, 99 S.E.2d 34.[8]

In Doremus v. Atlantic Coast Line Ry. Co., 242 S.C. 123, 130 S.E.2d 370, the court extended this rule to minors. In that case the court stated that the very nature of the injuries,[9] constituted sufficient evidence of disability.

In another case the court related:

In arriving at the verdict the jury could consider the loss of future earning power which requires a consideration of all matters which relate to the issue of the disability, the effect which that disability will have on plaintiff's capacity to work, the extent to which the disability will impair the plaintiff's earning capacity, the present value of all losses due to his impaired earning power. Jones v. Atlantic Refining Co., D.C., 55 F.Supp. 17, such physical pain and suffering as reasonably certain will of necessity result in the future from the injury. Ray v. United States, D.C., 277 F.Supp. 952.

■ Plaintiff is also allowed a reasonable recovery for pain and suffering, future medical expenses and any future damage resulting from permanent injury. Watson v. Wilkinson Trucking Company, 244 S.C. 217, 136 S.E.2d 286 (1964).

H. The medical evidence clearly points to the conclusion that plaintiff suffers a 5% disability of the whole person. When asked what result the adhesions caused by the peritonitis would have on the plaintiff's life, Dr. Schlosberg testified that with certainty a hazard existed at the present time as far as plaintiff's life expectancy was concerned. Plaintiff's expert further testified that if the present symptoms continued, physical activities of the plaintiff would be restricted, especially in any extreme conduct.

Not having the gift of clairvoyance, neither the court nor Dr. Schlosberg can predict with absolute certainty the path

---

8. Above quoted from Doremus v. Atlantic Coast Line Ry. Co., 242 S.C. 123, 130 S.E.2d 370.

9. "His injuries included a severe cerebral concussion; the loss of six teeth, requiring a permanent plate which must be changed as he grows older; a compound fracture of the jawbone, which was fragmented into multiple pieces, which was repaired by wiring the same together with the probability of infection therefrom later and an operation as a result thereof; a compound fracture of the upper part of the jaw through the palate and floor of the brain; the loss of one-third of his tongue, which, along with the loss of teeth, caused some speech impairment; fractures of the left femur and of the humerous of one arm, which fractures required wiring and pins to repair; multiple lacerations of the lips causing permanent scars which might later be removed by plastic surgery; damage to his nose making it necessary to rebuild the nose with a graft of bone taken from a rib; a laceration of the right thigh over the kneecap ten centimeters in length; and the complete destruction or stoppage of the tear ducts causing eye infection and making necessary a future operation or operations to correct the same." Doremus, supra, at 380.

the health of this unfortunate youth will take in the future. It is a medical certainty that his future health is uncertain, that a very real hazard at the present time exists, and there was no reason for Dr. Schlosberg to feel that these conditions would disappear.

There is every reasonable and probable certainty that the physical disability of the plaintiff will have a detrimental effect on his future earning capacity. While the court cannot say with absolute finiteness or with precision precisely how the future earning capacity will be impaired and endangered, this is not the test. The medical evidence points squarely to the probability and certainty that plaintiff's life's activities have been limited and will continue to be limited. The court cannot afford to gamble with justice or with the future of the plaintiff. He has but one day in court. A negligent defendant cannot breathe a sigh of relief because an injured plaintiff is denied the ability to present to the court a crystal ball into which the court can gaze and discover with certainty the future damages sustainable by the minor plaintiff.

The plaintiff would urge, taking into account the mortality table expressed in Section 26–12, S.C.Code, 1962, the factors concerning the age, race, and sex of the young plaintiff, as well as assuming that he would complete college, and that Dr. Schwarzschild concluded that a person in the category of Robert Frank Steeves would earn $413,496.00 over their lifetime, that an award of $20,674.80 would be proper. This figure is based on work-life expectancy, which is less than that expressed in the mortality table, and is discounted at 4¼ percent. This is the discount used by the Honorable Donald Russell in Brooks v. United States, 273 F.Supp. 619, 634 (D.S.C.1967), and that rate seems appropriate here. Of course, this also takes into account the anticipated decreased purchasing power of the dollar. See Bowers v. Chas. & W. C. Ry. Co., 210 S.C. 367, 42 S.E.2d 705, 709; Vaughan v. Southern Bakeries Co., 247 F.Supp. 782, 789 (D.S.C.1965).

The defendant seemed to stress the fact, in cross-examining Dr. Schwarzschild, that there is a possibility that the young man injured will in fact suffer no economic loss. But, a negligent defendant is not entitled to enjoy the fruits of fortuitous circumstances, employer generosity, or diligent effort on the part of the injured plaintiff. The facts clearly demonstrate there exists a deficiency in plaintiff's earning capacity because of the injury. It is well settled that the fact finder must assess damages in accord with capacity, or a diminution of capacity, rather than what post-event salary may actually be. Daugherty v. Erie R. Co., 403 Pa. 334, 169 A.2d 549, 551, 552; Wiles v. New York, Chicago and St. Louis Ry. Co., 283 F.2d 328, 332 (3rd Cir. 1960); Myers v. Pearce, 102 Ga.App. 235, 115 S.E.2d 842, 850, 851; Yates v. Dann, 167 F.Supp. 174, 178 (D.Del.1958).

The court, however, rejects in part the position of the plaintiff but the plaintiff has met the test of *Doremus,* supra, and *Matthews,* supra, and is entitled to an award for impairment to future earning capacity. Therefore, taking into consideration plaintiff's life expectancy from the reaching of his majority, *Doremus,* supra, along with consideration being given to plaintiff's work-life expectancy,[10] rising salaries resulting in increase of earnings along with the decreasing purchasing power of today's dollar, and reducing this amount to its present value by a factor of 4¼ per cent, the court feels an award of $9800 is just and proper for loss of future earnings and impairment to plaintiff's earning capacity.

I. An award of $10,000 for past pain and suffering as well as mental anguish

---

10. In Ray v. United States, 277 F.Supp. 952 (D.S.C.1968), this court rejected the social security age of 62 as the end of one's work-life expectancy.

is granted. The evidence clearly supports the fact that plaintiff suffered the agony of a ruptured appendix which would encompass the pain prior to operation and subsequent recovery as well as emotional adjustment.

J. An award of $100 a year for plaintiff's life expectancy is made as compensation for future pain, emotional stress resulting from the probability of total obstruction resulting from adhesions and for future medical damages.

K. Further award of $50 per year is made for restriction on physical activities and loss of recreational ability. This is for life expectancy of plaintiff.

L. No award is made for past medical expenses.

■ M. An award for loss of services to be performed by plaintiff for his parents, named plaintiffs in the companion case, is made because the record will support a finding that his ability to perform services is impaired. An award of $3,000.00 is made to plaintiff for expenses incurred by then which directly results from the negligence actions of defendant and resulting physical condition of plaintiff Bobby Frank Steeves and for impairment to his ability to render services to his parents.

N. An award in the following amounts is found:

| | |
|---|---|
| Loss of Earnings and Impairment to Earning Capacity | $ 9800.00 |
| Past Pain and Suffering | 10,000.00 |
| Future Pain and Suffering | 5680.00 |
| Loss of Recreation, et cetera | 2840.00 |
| Total | $28,320.00 |
| Expenses of Parents and Loss of Services | 3,000.00 |
| Total Award | $31,320.00 |

The Clerk will enter judgment in accordance with the findings and conclusions hereinabove.

And it is so ordered.