2311

Rebecca Ann WALL and Barry Wall, as Guardians ad Litem of Katlyn Brenn Wall, a Minor, Respondents v. G.S. SUITS, M.D., Appellant, and Rebecca Ann WALL and Barry Wall, Respondents v. G.S. SUITS, M.D., Appellant.

(458 S.E. (2d) 43)

Court of Appeals

*Charles E. Carpenter, Jr.* and *Deborah Harrison Sheffield,* both of *Richardson, Plowden, Grier & Howser,* of Columbia; and *William U. Gunn,* of *Holcombe, Bomar, Cothran & Gunn,* of Spartanburg, *for appellant.*

*Michael Parham* of *Parham & Smith,* Greenville, *for respondents.*

Heard Jan. 10, 1995.

Decided Feb. 27, 1995.

SHAW, Judge:

These medical malpractice claims arise out of the diagnosis of a tumor located in Respondent Katlyn Wall's neck, and the surgery to remove the tumor which resulted in severe injury to Katlyn's facial nerve. The jury awarded $142,000.00 actual damages to Katlyn's parents, and $850,000.00 actual damages to Katlyn. Appellant appeals both verdicts on the issues of liability and improper jury charge. He also appeals the trial

judge's denial of a new trial based on the excessiveness of the jury verdict. We affirm.

In an action at law, on appeal of a case tried by a jury, the jurisdiction of the appellate court extends merely to correction of errors of law, and a factual finding of the jury will not be disturbed unless a review of the record discloses that there is no evidence which reasonably supports the jury's findings. *Townes Associates, Ltd. v. City of Greenville*, 266 S.C. 81, 221 S.E. (2d) 773 (1976).

Approximately two months after Katlyn was born, Ms. Wall noticed a knot in the front of Katlyn's right ear. On October 15, 1990, Ms. Wall took Katlyn to see Appellant, for a surgical consultation. After a physical examination, Appellant diagnosed the knot as lymphangioma, and arranged to have it surgically removed on October 25, 1990. There is no dispute that proper treatment of a lymphangioma is surgical removal. Upon making the incision, however, Appellant observed that the tumor looked different than he expected. Nevertheless, Appellant proceeded to remove it.

A pathology report later confirmed the tumor was not, in fact, a lymphangioma, but was a hemangioma. Appellant and both experts agree that a hemangioma should not immediately be surgically removed. Rather, hemangioma tumors generally spontaneously disappear after a period of time, and surgery is not necessary.

It became apparent immediately after the surgery that Katlyn had a partial paralysis (paresis) on the right side of her face, causing that side to droop. It was later determined Appellant had transected the trunk of Katlyn's facial nerve. Katlyn continued to see Appellant until April 2, 1991, when he referred her to a plastic surgeon in Spartanburg. The plastic surgeon immediately referred Katlyn to Dr. Julia Terzis, a plastic surgeon in Norfolk, Virginia. Dr. Terzis noted the following problems:

> [Katlyn] had a global right facial paralysis. That means she was unable to raise the eyebrow; she was unable to close her eyes; there was no appearance or presence of a blink on the right eye; there was uncontrolled blinking on that side; there was no smile line, or nasolabial fold; there was no pressure generated on the right creek; and she was drooling and dribbling when she was asked to drink.

So she had difficulty using a straw and she had no movement in the depressor or the platysma muscles. So she had a global paralysis on the right.

Dr. Terzis began the first of a series of operations on Katlyn on April 18, 1991. On this date, Dr. Terzis had to harvest a nerve graft from Katlyn's left leg and graft the proximal facial nerve to its five corresponding distal branches. By August 25, 1993, Katlyn had reached a plateau as far as the improvement expected from the April 1991 surgery. At that time, her eye closed completely, although the blink in that eye was incomplete and a little slower than that in the left. Also, except in extremes of animation, her face appeared much more symmetrical. However, Dr. Terzis anticipated the need for two, and possibly three, more reconstructive surgeries in the future. Dr. Terzis and Appellant both agreed Katlyn will never be "normal."

## I.

Appellant contends the jury's verdicts are against the fair preponderance of the evidence. We disagree. The trial judge has the authority to grant a new trial when, sitting as the thirteenth juror charged with the duty of seeing that justice is done, he is convinced that a new trial is necessitated on the basis of the facts in the case. *Graham v. Whitaker*, 282 S.C. 393, 321 S.E. (2d) 40 (1984). The decision of whether to grant a new trial is within the sound discretion of the trial judge, and his decision will not be disturbed absent a clear abuse of that discretion. *Id. See* also *Ford v. A.A.A. Highway Express*, 204 S.C. 433, 29 S.E. (2d) 760 (1944).

Respondents alleged that (1) Appellant was negligent in misdiagnosing the tumor; (2) Appellant negligently chose to perform the surgery; and (3) Appellant negligently performed the surgery. Both Appellant and Respondents presented expert testimony addressing each of the three allegations of negligence. Respondents' expert, Dr. Campbell, testified that it was at least five times more likely that a lesion in a two month old would be a hemangioma rather than a lymphangioma. Therefore, the overwhelming odds are that the lesion in a child like Katlyn would be a hemangioma which does not generally require surgery.

While Dr. Campbell did not fault Appellant for his initial misdiagnosis, he testified that once the tumor was exposed, following minimum standards of care, Appellant should have been able to visually differentiate between the lymphangioma and the hemangioman. After making an incision, Appellant admitted he recognized the tissue was different from that of a lymphangioma, noting it was "more of a solid mass that was a dark brownish red in color." All the physicians agreed that a lymphangioma is typically an amber color. On the other hand, a hemangioma is red or dark red in color.

Dr. Campbell stated further that Appellant failed to conform to minimum standards of care, when he neglected to have the tumor biopsied to confirm it was a hemangioma after Appellant noted the tumor's darker color.[1] A biopsy would have certainly revealed the true nature of the tumor and Appellant could have immediately ended the surgery. If Appellant would have stopped at this point, Dr. Campbell testified, Katlyn most probably would not have suffered her injuries.

Dr. Campbell further charged Appellant failed to follow the minimum standards of care when performing the surgery. Dr. Campbell cited two shortcomings in Appellant's surgical technique. First, Appellant failed to follow the accepted standard of care in locating the facial nerve at its beginning and then tracing all the branches. Second, the minimum standard of care required Appellant to conduct nerve stimulation to determine where he could safely cut without severing any nerves. This procedure is done with a small instrument, a nerve stimulator. While a nerve stimulator was available in the operating room at the time of Katlyn's surgery, Appellant chose not to use the instrument. We find ample evidence in the record to support the jury's finding of liability on the part of Appellant.

---

[1] Although denied by Appellant, Respondent presented evidence that Appellant did, in fact, come to the conclusion that the tumor was a hemangioma when he exposed it prior to removal. A nurse's note in the operating room described the specimen as hemangioma. Dr. Campbell stated this description would have been given to the nurse by the surgeon. Also, Ms. Wall testified that morning, following the surgery, Appellant told her the tumor was a hemangioma.

## II.

Appellant contends the trial judge erred when he refused to charge the jury that a mistake in diagnosis is not in and of itself malpractice. We disagree.

Ordinarily, a trial judge has a duty to give a requested instruction that correctly states the law applicable to the issues and the evidence. However, to warrant reversal for refusal to give a requested instruction, the refusal must have been erroneous and prejudicial. *Sherer v. James,* 286 S.C. 304, 334 S.E. (2d) 283 (Ct. App. 1985), rev'd on other grounds, 290 S.C. 404, 351 S.E. (2d) 148 (1986). A refusal to give a properly requested charge is not error if the general instructions are sufficiently broad to enable the jury to understand the law and the issues involved. *Waldrup v. Metropolitan Life Ins. Co.,* 274 S.C. 344, 263 S.E. (2d) 652 (1980).

At trial, appellant requested the trial judge charge the mistaken diagnosis language, citing the United States District Court case of *Steeves v. United States,* 294 F. Supp. 446 (D.S.C. 1968). In that case, Judge Hemphill ruled as follows:

> The law is settled that a wrong diagnosis will not of itself support a verdict in a malpractice suit. *However, a physician must use ordinary care in reaching his diagnosis.* (Emphasis added; citations omitted.)

Appellant failed to include the above emphasized language in his request to charge. However, even if we were to assume *arguendo* that appellant's requested charge was a proper statement of law, we find no prejudice.[2] The instructions of the trial judge, considered in their entirety, were sufficiently broad to enable the jury to understand the law and the issues involved.

The trial judge gave the following relevant charges to the jury:

> When a physician undertakes to treat a patient, the law does not require absolute accuracy either in his practice or his judgment nor does the law hold a physician to the standard of infallibility. The law does not require the ut-

---

[2] We express no opinion on the propriety of the requested charge, whether or not it includes the emphasized language.

most degree of care and skill, and skill of which the
human mind is capable.

. . . .

When a physician undertakes to treat a patient, the law
requires the physician to use reasonable care and dili-
gence in the exercise of his skill and in the application of
his learning.

. . . .

Treatment includes the diagnosis of the patient's condi-
tion, and the course of care of the patient by the physician.

. . . .

Thus, if you find that the defendant in this case used due
care and skill in treating his patient and that the defen-
dant followed recognized medical procedures, and despite
this, the plaintiff suffered damages or injuries, the fact of
injury or damage alone is not evidence of negligence, and
your verdict in the case would be for the defendant.

Considering the trial judge's charge as a whole, we find no
prejudice resulting from the failure to charge the language on
mistaken diagnosis. Indeed, the charge in its entirety indi-
cates a mistaken diagnosis alone is insufficient to support a
finding of malpractice.

### III.

Finally, Appellant contends he is entitled to a new trial
based on the excessiveness of the $850,000 verdict for
Katlyn. We disagree.

While a trial judge may grant a new trial absolute on
the ground the verdict is excessive or inadequate, the
jury's determination of damages is entitled to substan-
tial deference. *Rush v. Blanchard,* 310 S.C. 375, 426 S.E. (2d)
802 (1993). Thus, the trial judge should grant a new trial based
on excessiveness of the verdict only if the amount is not
merely different from that which he would have awarded, but
is so grossly excessive so as to shock the conscience of the
court and clearly indicates the figure reached was the result
of caprice, passion, prejudice, partiality, corruption, or other
improper motives. *Id.* The decision of whether to grant a new
trial is within the sound discretion of the trial judge and ordi-
nary will not be disturbed on appeal. *Id.*

Katlyn's mother and father testified Katlyn suffered a tremendous amount of pain following the surgery performed by Appellant, and was still in a great amount of discomfort on October 29, 1990, at which time a controlled substance was prescribed for her pain. They further testified Katlyn had to endure between 7 and 10 painful nerve conduction studies at which time five needles were inserted into her forehead, eye, cheek, chin and neck so as to shock each nerve. The test must be performed without the benefit of anesthesia and lasts approximately $\frac{1}{2}$ hour, during which time Katlyn must be restrained. Because Katlyn screams and cries from the pain, her father physically removes himself from the building. The parents stated Katlyn was in intensive care for 2 days following surgery performed by Dr. Terzis. She had a cast on her head, was on a respirator, and was unable to suck on a bottle. Additionally, she had an incision from above her left knee down to her heel as a result of the graft. Finally, both parents stated Katlyn had begun to notice her deformity.

We find the record contains an abundance of evidence that Katlyn has suffered severe facial disfigurement, endured substantial pain and suffering, and likely will endure much more throughout the additionally anticipated surgeries. Accordingly, we find no abuse of discretion in the denial of the new trial motion based on the excessiveness of the verdict.

Affirmed.

SHAW, GOOLSBY, JJ., and HOWARD, Acting J., concur.